HINKLE NORTHWEST, INC., Ernest F. Hinkle, Kenneth T. LaMear and Dennis B. Reiter, Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

No. 79–7005.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1981.

Decided April 9, 1981.

---

**22.** *In re Stanley*, 54 Cal.App.3d 1030, 126 Cal. Rptr. 524 (1976).

Norman J. Wiener, R. Alan Wight, Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., on brief; James N. Westwood, Portland, Or., for petitioners.

Michael K. Wolensky, Asst. Gen. Counsel, Washington, D.C., for respondent.

Before CHOY, FERGUSON and REIN-HARDT, Circuit Judges.

FERGUSON, Circuit Judge:

Petitioners seek review of a suspension order of the Securities and Exchange Commission ("SEC") following a finding that they willfully violated recordkeeping, reporting, and financial-responsibility rules. We find that petitioners were correctly determined to be owners of the securities in issue, that the SEC was not collaterally estopped from so asserting, and that the sanctions imposed were justifiable. We therefore affirm.

## I.

In early 1975, Benjamin Franklin Savings and Loan Association ("Franklin") of Portland, Oregon opened an account with Hinkle Northwest, Inc. ("Northwest"), a registered broker-dealer and investment adviser. Jack Wied, at that time treasurer and a vice-president of Franklin, conducted his employer's business with Northwest. Wied engaged in municipal securities trading for Franklin's account.

Some months later, Wied entered into an arrangement with the officers of Northwest to use Franklin's credit to buy, in two transactions, over $125,000,000 in securities for Northwest's account through the mechanism of open reverse repurchase agreements ("reverse repos").[1] Although Franklin's credit was to be used for these purchases, Northwest was to be the owner of the securities and the transactions were to be concealed from Franklin. Northwest's officers approved the transactions, and Northwest ultimately reaped over $120,000 in profit without having pledged any of its own credit as collateral. Northwest paid over $15,000 in "gratuities" to Wied.

In 1977, Wied was convicted of misapplying Franklin's credit and making false entries. The SEC brought civil proceedings against Northwest and its officers/directors, Ernest F. Hinkle, Kenneth T. LaMear, and Dennis B. Reiter. The SEC, affirming the findings of an administrative law judge, found Northwest and its three directors in violation of recordkeeping and minimum net capital provisions. Specifically, the SEC found that Northwest, aided and abetted by Hinkle, LaMear, and Reiter, willfully violated the following provisions:

1. Section 17(a), Securities Exchange Act of 1934, 15 U.S.C. § 78q(a) and Rule 17a–3 thereunder, 17 C.F.R. § 240.17a–3, in that the two reverse repos were not properly recorded in Northwest's books;

2. Section 15(c)(3), Securities Exchange Act of 1934, 15 U.S.C. § 78o(c)(3) and Rule 15c3–1 thereunder, 17 C.F.R. § 240.15c3–1, in that unrealized losses on the reverse repos caused Northwest to operate with impermissibly high net capital deficiencies on five occasions during April, 1975;

3. Section 17(a), Securities Exchange Act of 1934, 15 U.S.C. § 78q(a) and Rule 17a–11 thereunder, 17 C.F.R. § 240.17a–11, in that Northwest failed to give the required telegraphic notice of its net capital deficiencies and to file the required follow-up financial reports; and

4. Section 17(a), Securities Exchange Act of 1934, 15 U.S.C. § 78q(a) and Rule 17a–5 thereunder, 17 C.F.R. § 240.17a–5, in that Northwest's annual report of May 31, 1975 did not disclose the account balances relating to the reverse repos.[2]

1. By a reverse repurchase agreement, a seller in effect loans to a buyer the money with which to purchase a security from the seller. In practice, the seller sells a security to the buyer, who immediately sells it at the same price back to the seller, pays interest on the purchase price, and agrees to buy it back again at a later date. The original seller all the while retains a possessory security interest in the security pending repayment. The transaction is subsequently "unwound" when the security is sold on the open market. When, as here, the date of un-

winding is not specified, the reverse repo is termed "open."

The original buyer realizes a gain only if, at the time of unwinding, the market price of the security has so appreciated as to exceed the original purchase price (principal) plus accrued interest. Otherwise, the buyer is liable to the seller for the resulting deficiency.

2. At the same time, the SEC also found Hinkle and LaMear in violation of 15 U.S.C. § 77e(b)(1) for engaging in a "hard sell" under an improper prospectus and found Hinkle in violation of 15 U.S.C. § 78o(b)(4)(E) for inade-

The SEC order suspended Northwest from underwriting activities for 30 days, suspended Hinkle, LaMear, and Reiter from association with any broker or dealer for, respectively, 12 months, 12 months, and 3 months, and barred Hinkle, LaMear, and Reiter from collecting any money from Northwest or from participating in Northwest's activities in any manner during the periods of their suspension. Northwest and its directors petition this court for review of that order. 15 U.S.C. § 78y(a)(1).

## II.

■ The SEC found petitioners in violation of the above regulatory provisions based upon various factual findings. We must accept those findings unless they are unsupported by substantial evidence. *Sartain v. Securities and Exchange Com'n*, 601 F.2d 1366, 1372 (9th Cir. 1979); 15 U.S.C. § 78y(a)(4).[3] We conclude that the challenged findings are supported by the record.

### A. Northwest Owned the Securities

The central issue in this case revolves around whether Northwest owned the securities purchased by means of the reverse repos. Petitioners concede that if they owned the securities they were under an obligation, subject to their other defenses, to comply with the recordkeeping and net capital provisions. The SEC in turn acknowledges that if Northwest was not the securities' owner, Northwest and its directors would no more be in violation of the provisions than would any unrelated third party.

The SEC opinion determined

that Wied was purchasing securities for registrant's [Northwest's] account, and

that registrant would have all the attributes of ownership. It could dispose of the securities when it wished, and stood to gain any profit and suffer any loss.

Petitioners concede that Wied purchased the securities for Northwest's account and that Northwest accepted the risk of loss or gain on the transaction. They quarrel, however, with the conclusion that Northwest owned the securities.

■ "Ownership" is "a collection of rights to use and enjoy property including the right to sell and transmit the same." *Energy Oils, Inc. v. Montana Power Co.*, 626 F.2d 731, 736 (9th Cir. 1980) (citations omitted). *See* VI American Law of Property § 26.1 at 409 (A. Casner, ed. 1952). Northwest enjoyed these powers as well as other indicia of ownership, including risk of profit or loss. The record contains ample support for the finding of ownership.[4]

### B. Sufficient Willfulness Was Demonstrated

Petitioners contend that the SEC failed to demonstrate that they violated the securities rules willfully. They claim that only acts of omission have been shown (e. g., failure to file reports, failure to meet net capital requirement), and that no inference of willfulness can be drawn from such.

■ In certain circumstances, "willfulness" does not carry a "connotation of evil intent; it means only that the act was a conscious, intentional action." *Nees v. Securities and Exchange Com'n*, 414 F.2d 211, 221 (9th Cir. 1969) (construing Securities Exchange Act of 1934, 15 U.S.C. § 78o). In the instant case, petitioners were aware that Wied was purchasing securities for

---

quate supervision of an employee. Petitioners do not seek review of those findings.

**3.** Petitioners ask us to reverse unless we determine that the SEC proved these violations by "clear and convincing evidence." They urge us to adopt the reasoning of *Collins Secur. Corp. v. Securities & Exchange Com'n*, 562 F.2d 820, 826 (D.C.Cir. 1977). *See Sartain v. Securities & Exchange Com'n*, 601 F.2d 1366, 1371 (9th Cir. 1979). The Supreme Court recently considered and rejected *Collins'* "clear and con-

vincing standard of proof." *See Steadman v. Securities & Exchange Com'n*, —— U.S. ——, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981). We accordingly decline petitioners' invitation.

**4.** Anglo-American law places little emphasis on the term ownership in a technical sense. J. Cribbet, Principles of the Law of Property 16 (2d ed. 1975). This may explain why, although it is of central importance to the case, neither side discusses the determinants of ownership.

their account, and that they would have all the attributes of ownership, yet they failed to report the transactions on the company books or to file the appropriate forms with the SEC. Petitioners had substantial expertise in the securities field. The SEC found that they should have been, and almost certainly were, aware that purchases of securities had to be recorded on their books, adjusted to reflect market value. *See* Rule 15c3–1(c)(2)(i), Securities Exchange Act of 1934, 17 C.F.R. § 240.15c3–1(c)(2)(i). Petitioners' intentional action, as experienced security brokers, in authorizing Wied to proceed on their behalf, together with their dereliction of regulation requirements, furnishes the requisite level of intent.

■ Petitioners answer that when the instant transactions were undertaken in 1975, the reverse repurchase agreement was a new mechanism. (The SEC adopted no accounting standards explicitly geared to reverse repos until 1976.) From this fact, they contend that the pre-existing securities rules, which the SEC alleged petitioners violated, were inapplicable to reverse repos. They conclude, accordingly, that they could not have willfully violated the regulations.

Petitioners' only evidence as to how reverse repos should have been treated under the existing rules was the testimony of David Asson, an accountant. Asson testified that proper accounting under the rules would have required no recordation of the reverse repos. He, however, based his opinion on the hypothetical assumption that the financial institution (Franklin) rather than the broker (Northwest) could determine if and when to sell the securities. Here, Northwest, not Franklin, had the power to sell. Thus, Asson's testimony did not address proper accounting procedure for the facts of this case. Accordingly, petitioners have not demonstrated that the absence of specific accounting standards for reverse repos excused their failure to comply with the requirements attendant upon all purchases of securities by registered broker-dealers. Moreover, Asson admitted on cross-examination that brokerage firms are required to compute their net capital based upon the market price of *any* security in their account, adjusting for any unrealized profit or loss.

Therefore, we conclude that the record evidences the requisite element of willfulness.

### III.

Petitioners contend that the Government proved certain facts in its criminal prosecution of Wied that are inconsistent with the SEC's position in the instant case. According to petitioners, the district court in the Wied criminal case found Franklin to be purchaser and owner of the securities. They conclude therefrom that Northwest could not have been the owner and that the SEC is collaterally estopped from so claiming.

■ A. Collateral estoppel prevents a party from contesting in subsequent litigation a fact previously determined adversely to him. *Cromwell v. County of Sac*, 94 U.S. 351, 24 L.Ed. 195 (1877); Note, The Double Jeopardy Clause as a Bar to Reintroducing Evidence, 89 Yale L.J. 962, 970–71 (1980). In the normal context, one private litigant can prevent another from denying an issue determined against the latter in a previous civil suit to which both were parties. *See* 1B Moore's Federal Practice, § 0.441[2] (2d ed. 1980).

While petitioners would be precluded from asserting collateral estoppel under the traditional paradigm, the doctrine has been expanded in recent years. The instant case differs from the traditional paradigm in five salient respects. The first three factors would not prevent assertion of collateral estoppel under the modern view. Thus, we are not troubled that petitioners wish to import the finding of a criminal case into civil litigation, *see St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 868 (9th Cir. 1979); *Ivers v. United States*, 581 F.2d 1362, 1367 (9th Cir. 1978), that they seek to estop the United States rather than a pri-

vate litigant,[5] *see Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 157, 83 S.Ct. 554, 561, 9 L.Ed.2d 644 (1963), or that the petitioners, who seek to use estoppel, were not parties to the previous litigation, *see Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 332–33, 99 S.Ct. 645, 652–53, 58 L.Ed.2d 552 (1979) (offensive use of estoppel); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (defensive use).[6] *See generally* Kelly & Rothenberg, The Use of Collateral Estoppel by a Private Party in Suits Against Public Agency Defendants, 13 U.Mich.J.L.Ref. 303 (1980). The remaining two factors, however, would require a radical departure from current notions of issue preclusion.

■ First, the fact that the party against which estoppel is urged was not involved in the previous case raises grave problems. Traditional estoppel binds only the party to a previous litigation and those in privity with that party. *See* 1B Moore's Federal Practice, *supra,* ¶ 0.411[1]. The doctrine of privity has been eroded in recent years. *See United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir. 1980); *Jackson v. Hayakawa,* 605 F.2d 1121, 1126 (9th Cir. 1979), *cert. denied,* 445 U.S. 952, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Whether the SEC and the United States Attorney for the District of Oregon meet even the attenuated requirements of privity for estoppel purposes is a serious question. Second, even if privity is found, petitioners wish to preclude the SEC on the basis of a fact which was determined favorably to the SEC's privy in the previous litigation, rather than on the basis of a fact proved adversely. In both these respects, petitioners require an expansion of collateral estoppel beyond that applied in *Parklane Hosiery* and *Blonder-Tongue, supra.*

■ For the reasons set forth below, we conclude that nothing in the Wied criminal case is inconsistent with the SEC's position in the instant case. We therefore express no view as to whether estoppel should be expanded in the manner petitioners urge.

B. The grand jury returned a fifteen-count indictment against Wied. Counts I, II, III, XIV, and XV allege only that Wied misapplied Franklin's credit; counts IV and V, that Wied fraudulently benefited by a transaction of Franklin's. These counts imply nothing about ownership of the securities purchased via the reverse repos. The remaining counts[7] allege that Wied made false entries into Franklin's books, misrepresenting the amounts of securities purchased (counts VI and IX), securities sold (counts VIII, X, XI, XII, and XIII), and funds borrowed and repaid under reverse repos (counts VII–XIII). These remaining counts could reflect, as petitioners infer, misrepresentations concerning securities which Franklin owned exclusively. They are equally consistent, however, with Franklin's having bought the securities for the account of another or jointly with another.[8] Because the face of the indictment

---

**5.** Petitioners point to the line of cases culminating in *United States v. Wharton,* 514 F.2d 406 (9th Cir. 1975), for this proposition. That case, however, dealt with equitable estoppel, not collateral estoppel.

**6.** The doctrine of mutuality is today in its death-throes. *See* Callan & Kadue, To Bury Mutuality, Not to Praise It: An Analysis of Collateral Estoppel After *Parklane Hosiery Co. v. Shore,* 31 Hastings L.J. 755 (1980); Note, Nonmutuality: Taking the Fairness Out of Collateral Estoppel, 13 Ind.L.Rev. 563 (1980).

**7.** These remaining counts all arise under 18 U.S.C. § 1006:
> Whoever, being an officer . . . of . . . any . . . savings and loan . . . association . . ., with intent to . . . deceive any . . . agent of . . . the

United States, makes any false entry in any . . . statement of . . . such institution, . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

This statute requires no finding as to ownership.

**8.** There is nothing inconsistent between one party's ownership of a res and another party's concurrent ownership. *See* J. Cribbet, Principles of the Law of Property 94 (2d ed. 1975). Multiple interests in a single item of property are firmly established principles of Anglo-American law, dating back at least to the thirteenth century. *See* I American Law of Property § 1.8 at 14 (A. Casner, ed. 1952) (life estates); II *id.* § 6.1 at 3 (joint tenancies).

does not require a finding of Franklin's exclusive ownership of the securities, we examine the unpublished opinion in the Wied case to determine whether it is in any manner inconsistent with the present case.

Judge Skopil's opinion finds that Franklin had "substantial involvement" with both the reverse repo transactions. But it does not, as petitioners claim, find Franklin to have been the owner of the securities. Indeed, the heart of the opinion merely finds that:

In March and August, 1975, defendant initiated reverse repo transactions which were intended to benefit and did benefit HNW [Northwest] and defendant. These transactions put the credit of Benj. Franklin at risk, however, and defendant failed to properly report them to the Association's [Franklin's] top management.

This language carries no implication concerning ownership. Furthermore, elsewhere in the opinion, the judge noted that the type of reverse repos there in issue typically required the third party (in that case, Northwest) to pay Franklin for the security. If anything, that finding militates towards construing ownership exclusively in Northwest.

In the proceeding here under review, the SEC found vested in Northwest various incidents from which ownership flows. Nothing in either the indictment or opinion in the Wied case is inconsistent with the finding that Northwest enjoyed those incidents of ownership. Accordingly, even assuming *arguendo* that collateral estoppel could be successfully urged between parties situated as those here, no estoppel would arise to prevent the SEC from finding ownership in Northwest.

### IV.

 Finally, petitioners challenge the sanctions imposed by the SEC. Because "the relation of remedy to policy is peculiarly a matter for administrative competence," *American Power & Light Co. v. Securities and Exchange Com'n*, 329 U.S. 90, 112, 67 S.Ct. 133, 145, 91 L.Ed. 103 (1946), we will not disturb SEC sanctions unless they are either unwarranted in law or without justification in fact. *Sartain v. Securities and Exchange Com'n*, 601 F.2d 1366, 1374 (9th Cir. 1979). *See Butz v. Glover Livestock Com'n Co.*, 411 U.S. 182, 185, 93 S.Ct. 1455, 1457, 36 L.Ed.2d 142 (1973). The sanctions imposed—temporary suspension of petitioners' right to underwrite activities and associate with brokers and dealers—fall afoul of neither requirement.

As to warrant in law, the SEC was empowered not only to suspend petitioners' activities, but completely and permanently to revoke their registration. 15 U.S.C. § 78 *o*(b)(6). Ample justification in fact also supports the suspension. Petitioners' violations were serious. *See Touche Ross & Co v. Redington*, 442 U.S. 560, 570, 99 S.Ct. 2479, 2486, 61 L.Ed.2d 82 (1979); *Blaise D'Antoni & Ass., Inc. v. Securities and Exchange Com'n*, 289 F.2d 276, 277 (5th Cir.), *cert. denied*, 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961). In addition, they had violated recordkeeping and customer protection provisions in the past, some of them sought to deceive the SEC staff investigators probing into their financial irregularities, and others engaged in "hard sell" tactics.

Petitioners raise a wealth of specific arguments to avoid the above analysis. They are factually incorrect in claiming that theirs was a first offense and that they could not have reasonably understood that they were in violation of reporting requirements. Their further contentions that no third party was injured by their violations and that Northwest had already suffered substantial financial impact do not require reversal. The conclusion therefore follows that the sanctions should not be overturned as unwarranted in either law or fact.

The SEC decision and sanctions are AFFIRMED.