**In the Matter of Petition for Naturalization of Sergio Elejar MENDOZA, Petitioner-Appellee,**

v.

**UNITED STATES of America, Respondent-Appellant.**

No. 79–3478.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 6, 1981.

Decided April 2, 1982.

Rehearing and Rehearing En Banc Denied July 22, 1982.

Frank O. Bowman, Dept. of Justice, Washington, D. C., for respondent-appellant; Frederick M. Brosio, Jr., Asst. U. S. Atty., Los Angeles, Cal., on brief.

Donald L. Ungar, Simmons & Ungar, San Francisco, Cal., for petitioner-appellee.

Before TANG and NORRIS, Circuit Judges; and CARROLL,* District Judge.

NORRIS, Circuit Judge:

The issue raised by this appeal is whether the district court abused its discretion in collaterally estopping the government from relitigating the constitutionality of the Attorney General's decision to withdraw a naturalization examiner from the Philippines in 1945. We hold there was no abuse of discretion and affirm.

## I

## HISTORICAL BACKGROUND

The historical events giving rise to appellee Sergio Mendoza's claim for naturaliza-

---

* The Honorable Earl H. Carroll, United States District Judge for the District of Arizona, sitting by designation.

tion are undisputed. In March, 1942, Congress amended the Nationality Act of 1940, Pub.L. No. 76–853, 54 Stat. 1137 (1940) to provide for the naturalization of non-citizens who served honorably in the United States armed forces. Section 701 exempted alien servicemen from some of the usual naturalization requirements, such as a period of residence and literacy in English. Section 702 provided for overseas naturalization of those eligible under section 701 who were in active service in the military and not within the jurisdiction of any court authorized to naturalize aliens. Section 705 provided that the "Commissioner [of Immigration and Naturalization] with the approval of the Attorney General, shall prescribe and furnish forms, and shall make such rules and regulations, as may be necessary to carry into effect the provisions of this Act." The Act was subsequently amended to specify that all naturalization petitions filed under section 701 must be submitted by December 31, 1946. Act of Dec. 28, 1945, Pub.L. No. 79–270, (c), 59 Stat. 658 (1945).

Pursuant to the Act, INS officers were sent overseas to naturalize eligible members of the United States military. From 1943–46, these officers traveled from post to post through England, Ireland, North Africa and the Pacific, naturalizing servicemen. In early August, 1945, following the liberation of the Philippines, the INS designated George Ennis, Vice Consul in Manila, to naturalize Filipino servicemen under the Act.[1]

The Philippines was scheduled to become independent on July 4, 1946. Philippine Independence Act of 1934, Pub.L. No. 73–127, § 10(a), 48 Stat. 463 (1934). The Philippine government apparently feared that naturalizations under section 702 would cause large numbers of Filipinos to emigrate to the United States, draining that country of much-needed manpower. These fears were communicated by the Philippine

---

1. The INS and the Attorney General had concluded that members of the Army of the Commonwealth of the Philippines qualified as servicemen in the United States armed forces.

government to the United States Department of State, which passed them on to the INS Commissioner. In September, 1945, the Commissioner wrote to the Attorney General:

> The Philippine Government again has expressed to the Department of State its concern because Filipino members of the armed forces of the United States are being naturalized even though they have always been domiciled in the Philippine Islands. . . . In view of the concern expressed by the Philippine Government, it is my belief that the situation might best be handled by revoking the authority previously granted to Mr. Ennis and by omitting to designate any representative authorized to confer citizenship in the Philippine Islands. This course would eliminate a source of possible embarrassment in our dealings with the Philippine people, who probably will be awarded independence in the near future.

Memorandum to Attorney General Tom C. Clark from INS Commissioner Ugo Carusi (September 13, 1945).

Acting upon the Commissioner's recommendation, the Attorney General revoked Vice Consul Ennis' naturalization authority and on October 26, 1945, naturalizations in the Philippines were halted. No new naturalization officer was appointed for the Philippines until August, 1946. Thus, for nine months no INS official was present in the Philippines to implement the 1940 Act.

## II

## THE MATTER OF NATURALIZATION OF 68 FILIPINO WAR VETERANS

In 1975, the claims of 68 Filipino war veterans whose petitions for naturalization pursuant to sections 701–705 of the Nationality Act of 1940 had been denied by the Immigration and Naturalization Service

(INS) were joined in the United States District Court for the Northern District of California. *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931 (N.D.Cal.1975) (Renfrew, J.) (*68 Filipinos*). The veterans claimed that although sections 701–705 of the 1940 Act had expired, their petitions should be granted because the United States government had failed to station in the Philippines from October 1945 to August 1946 an INS examiner authorized to naturalize members of the American armed forces pursuant to section 702 of the Act.

In his opinion, Judge Renfrew divided the petitioners into three categories. Category I consisted of those veterans who had taken action to become naturalized prior to December 31, 1946 but had not been processed by the INS. Category II consisted of those veterans who were eligible for citizenship under the 1940 Act but did not file petitions before the Act expired. Category III included those petitioners who were unable to prove eligibility for naturalization under the 1940 Act. *Id.* at 936–37.

Judge Renfrew found that Category I veterans had been victims of "affirmative misconduct" by the INS and that the government was thus equitably estopped from denying their petitions. In addition, Judge Renfrew held that Category I veterans had "constructively filed" their petitions for naturalization prior to the expiration of the 1940 Act, thus complying with the 1946 statutory deadline for filing. *Id.* at 937–40.

Judge Renfrew next addressed the claims of the Category II veterans. As a threshold matter, he ruled that their claim that their due process rights had been violated by the government's decision to withdraw naturalization authority from Vice Consul Ennis was not a non-justiciable "political question."[2] *Id.* at 943–48. He next held that

---

**2.** Judge Renfrew applied the six-pronged test set forth in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Noting that it is error to suppose that all cases touching upon foreign affairs are nonjusticiable, 406 F.Supp. at 945, he concluded that the judicial standards of equal protection and due process

are well-developed; that the case involved no "initial policy determination of a kind clearly for nonjudicial discretion," since Congress had already established the relevant policy by enacting Sections 701–705 of the 1940 Act; that there was no especial need for unquestioning adherence to a political decision already made

the constitutional claims were not barred by *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973).[3] 406 F.Supp. at 942–43. Finally, Judge Renfrew held that the government's withdrawal of its naturalization examiner from the Philippines during 1945–46 had deprived Category II veterans of their due process rights. Applying the equal protection component of the Due Process Clause of the Fifth Amendment, Judge Renfrew reasoned that:

> although the Court has no doubt that the actions of the Commissioner of the INS were motivated by reasonable concern for the maintenance of amicable relations between the United States and the Philippine Islands, that concern alone, when considered in light of the suspect nature of the classification herein, and the strictness of the applicable constitutional standard, is insufficient justification for violating petitioners' rights.

*Id.* at 951.

Accordingly, Judge Renfrew also granted the petitions of the Category II veterans.

Category III veterans were given 90 days to produce proof that they had served in the United States armed forces in the Philippines and were thus eligible for naturalization under the 1940 Nationality Act. *Id.* at 951. After 90 days, no such proof was forthcoming, and their petitions were denied.

The government filed a notice of appeal in *68 Filipinos* but subsequently withdrew its appeal.

## III

### DR. MENDOZA

Petitioner, Sergio Elejar Mendoza, is a 73-year old Filipino citizen currently residing in this country. He served in the armed forces of the United States as a medical doctor from December 1, 1941 until June 30, 1946. In 1942, he was captured by the Japanese and survived the notorious Bataan Death March. In February or March, 1945, Dr. Mendoza was released by the Japanese. In the fall of 1945, he was sent to the United States for army medical training, and spent approximately six months in Pennsylvania. Thereafter, he returned to the Philippines, where he stayed until his discharge from the military. At no time during 1945–46 did Dr. Mendoza make any efforts to become an American citizen.[4] In 1978, he filed for naturalization as a Filipino war veteran pursuant to sections 701–705, claiming that he was denied due process of law by the government's actions in 1945–46.[5] Judge Lucas found that Dr.

---

since it was unlikely that the foreign policy of the United States would be affected by the court's consideration of the merits in that case; and that there was little likelihood that "multifarious pronouncements by various departments on one question" would embarrass the United States. *Id.* at 945–47.

3. In *INS v. Hibi,* a Filipino who had served in the United States military sought naturalization under section 701 of the 1940 Act. The veteran claimed that the Government was equitably estopped from relying on the expiration date of the 1940 Act (December 31, 1946) because it had failed to advise him, during the time he was eligible, of his right to naturalization, and because the government had failed to provide a naturalization officer in the Philippines during the time he was eligible. 414 U.S. at 5–8, 94 S.Ct. at 19–21. The Court rejected this claim, ruling that while it remained an open question whether affirmative misconduct on the part of the government might estop it from denying citizenship, the failure to fully publicize the rights accorded war veterans un-

der the 1940 Act and the failure to station an authorized naturalization officer in the Philippines was not such misconduct. *Id.* at 8–9, 94 S.Ct. at 21–22.

*Hibi* was a summary reversal without the benefit of briefing or oral argument. The sole issue was one of equitable estoppel, and was therefore not, in Judge Renfrew's view, dispositive of the petitioners' constitutional claims in *68 Filipinos.* 406 F.Supp. at 942–43.

4. Such inaction is not surprising since many Filipino soldiers imprisoned by the Japanese were unaware of their right to apply for naturalization. *See, e.g., Olegario v. United States,* 629 F.2d 204, 211 (2nd Cir. 1980), *cert. denied,* 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

5. Mendoza last entered the United States on June 12, 1975, and was ordered to depart on June 29, 1978. Were this court to reverse the judgment below granting his petition for naturalization, he would be subject to deportation under 8 U.S.C. § 1251(a)(9) (1976).

Mendoza was a Category II veteran for the purpose of applying Judge Renfrew's decision in *68 Filipinos*, and he held the government collaterally estopped from relitigating the issues decided in *68 Filipinos*. The government appealed Judge Lucas' order granting Dr. Mendoza citizenship. We note jurisdiction under 28 U.S.C. § 1291.

## IV

### OTHER FILIPINO WAR VETERAN CASES

Prior to Judge Lucas' decision in Dr. Mendoza's case, two other district judges in this circuit held that the government is collaterally estopped by *68 Filipinos* from relitigating the constitutional issue raised by the Filipino war veterans. *See Petition of Nisperos*, 471 F.Supp. 296 (C.D.Cal.1979); *Petition of Crispulo Columna Colmenar*, No. 308–P–22551 (S.D.Cal. March 20, 1979). Shortly after Dr. Mendoza's petition was granted, however, the Second Circuit, in *Olegario v. United States*, 629 F.2d 204 (1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), held that the government was not collaterally estopped by *68 Filipinos* from contesting Olegario's naturalization petition; on the merits, the Second Circuit disagreed with Judge Renfrew in *68 Filipinos* and held that the government's decision to withdraw naturalization authority from Vice Consul Ennis violated no due process rights of Filipino veterans.

## V

### COLLATERAL ESTOPPEL

In the seminal case of *Parklane Hosiery Co. v. Shore*, 439 U.S. 332, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court held that federal trial courts have broad discretion to apply collateral estoppel offensively in the interest of avoiding needless litiga-

tion. In this case, we hold that Judge Lucas did not exceed the bounds of his discretion in estopping the government from relitigating, in opposition to Dr. Mendoza's naturalization petition, the constitutional issues decided in *68 Filipinos*. We agree with Judge Lucas that under the guidelines adopted in *Parklane Hosiery*, "offensive collateral estoppel would not in any way be unfair to the government" in this case. Accordingly, we affirm the judgment granting Dr. Mendoza's petition for naturalization.

### A.

The question of applying collateral estoppel offensively arises "when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." [6] *Parklane Hosiery*, 439 U.S. at 326 n.4, 99 S.Ct. at 649 n.4. *See also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Hinkle Northwest, Inc. v. S.E.C.*, 641 F.2d 1304 (9th Cir. 1981).

Writing for the Court in *Parklane Hosiery*, Justice Stewart stressed the need for caution in using collateral estoppel offensively because of the risk of unfairness to a defendant. First, the availability of offensive collateral estoppel may encourage potential plaintiffs to sit on the sidelines, taking a no risk "wait and see" attitude in the hope that another plaintiff will obtain a favorable judgment that can be invoked offensively against the defendant. Second, a defendant with little at stake in the first action, and thus little incentive to defend vigorously or to appeal an adverse judgment, might find himself, in a subsequent unforeseen action involving higher stakes,

**6.** In approving the use of collateral estoppel offensively, the Court in *Parklane Hosiery* sounded the death knell to the common law doctrine of mutuality of parties. Under the mutuality doctrine, one party could preclude another party from relitigating an issue that had been litigated in a previous suit only if both

had been parties to the original action. Thus, under the mutuality doctrine, the government would not have been foreclosed in this case from relitigating issues decided adversely to it in *68 Filipinos* because Dr. Mendoza was not a party to that action.

estopped from relitigating an issue decided against him in the earlier action. Third, the offensive use of collateral estoppel raises the specter that a defendant faced with identical claims by multiple plaintiffs may prevail in several actions, then be faced with an inconsistent adverse judgment that can be used offensively by future plaintiffs. Finally, offensive use of collateral estoppel may be unfair where the defendant in the first action is forced to defend in an inconvenient forum or where the second action affords the defendant significant procedural opportunities not available in the first action.

■ Notwithstanding these acknowledged risks of unfairness to a defendant, the Court was persuaded that the dual purposes of collateral estoppel—"protecting litigants from the burden of relitigating an identical issue . . . and promoting judicial economy by preventing needless litigation," 439 U.S. at 326, 99 S.Ct. at 649—justified a rule permitting discretionary use of offensive collateral estoppel in the federal courts. Thus, the Court concluded that "[t]he preferable approach for dealing with these problems in the federal courts is not to preclude the offensive use of collateral estoppel, but to grant the trial courts broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. at 651. In exercising that discretion, trial judges should be guided by the general rule that

"where a plaintiff could easily have joined in the earlier action, or where . . . the application of offensive collateral estoppel would be unfair to a defendant," *id.*, the defendant should be permitted to relitigate despite a prior adverse determination.[7]

### B.

The government contends that the application of offensive collateral estoppel by Judge Lucas as a basis for granting Dr. Mendoza's petition was grossly unfair and an abuse of discretion.[8] To support this contention, the government focuses on the Solicitor General's decision to withdraw the appeal in *68 Filipinos*,[9] allowing the judgment in that case to become final. The government claims that it grossly underestimated the number of persons who would be eligible for naturalization under *68 Filipinos*, and that the appeal was withdrawn "without a complete understanding of the implications of [Judge Renfrew's] decision." With no citation to the record, the government claims that it appeared at the time it withdrew the appeal that only "a fairly small number" (some 25,000 Filipino veterans, by an unidentified State Department estimate, plus derivatively eligible relatives) would be eligible for naturalization under *68 Filipinos*. Brief for Respondent-Appellant at 22. The government goes on to contend, still without record support, that the Solicitor General, acting on unspecified

---

7. In *Parklane Hosiery*, the district court refused to apply collateral estoppel offensively on grounds that it would deprive the defendant of its right to trial by jury. The Second Circuit reversed, applying collateral estoppel, and the Supreme Court affirmed. The Court reasoned, *inter alia*, that it was not unfair to collaterally estop Parklane Hosiery from relitigating, in a shareholders' class action, a determination in a prior action brought by the SEC that a proxy statement issued by Parklane Hosiery was false and misleading.

8. As a preliminary matter, the government also argues that the facts of Dr. Mendoza's case are quite different from *68 Filipinos*, since Dr. Mendoza spent approximately six months in the United States and was therefore not in the Philippines during much of the time that Vice Consul Ennis' naturalization authority was revoked. It is impossible to tell from Judge Renfrew's opinion the number of months that each

Category II veteran in *68 Filipinos* was eligible for United States citizenship under the 1940 Act but was deprived of the opportunity to become naturalized because of the Commissioner's decision to withdraw the examiner from the Philippines. In any event, the record shows that Dr. Mendoza was in the Philippines for as much as three months, during which time he was eligible under sections 701–705 but unable to become naturalized because no naturalization examiner was present. We think this is a sufficient period to implicate his due process rights and to place him in the same situation as other Category II veterans.

9. The Solicitor General, subject only to the general supervision and direction of the Attorney General, authorizes or declines to authorize the appeal of judgments adverse to the government. 28 C.F.R. § 0.20(b) (1980).

"new information," later reversed his position and decided to perfect appeals in all subsequent cases, including Dr. Mendoza's. *Id.*

The government fails to provide any record support for its claim that offensive collateral estoppel was unfairly applied by Judge Lucas in granting Dr. Mendoza's petition. We are not advised of the source of or basis for the original State Department estimate of 25,000 eligible Filipino veterans; nor are we advised of the nature or source of the "new information" claimed to be the basis of the Solicitor General's change in position. All we have from the government is an unsupported claim that 60,000–80,000 Filipino veterans "may yet" seek naturalization under *68 Filipinos.*[10]

 Even were we to accept the government's claim of error in its original estimate of eligible Filipino veterans, the new numbers of 60,000 to 80,000 give no meaningful indication of the consequences of barring relitigation of the issues decided in *68 Filipinos.* In basing its argument of unfairness on the number of persons eligible for naturalization under *68 Filipinos,* the government makes no distinction between those Filipino veterans who, like Dr. Mendoza, are likely to petition for naturalization, and those who have remained in the Philippines and have no interest in leaving their homeland to become United States citizens. Indeed, what is most astonishing about the government's vision of a horde of Filipino veterans applying for citizenship in reliance on *68 Filipinos* is what the government has failed to tell us: how many persons have in fact petitioned for naturalization on the basis of *68 Filipinos* since the judgment became final in 1977. We are dealing with a class of persons who served in the Philippines Army some 40 years ago. Common

sense tells us that the actual number likely to petition for naturalization in reliance on *68 Filipinos* is no more than a small fraction of the undocumented numbers cited by the government. In fact, this was the case as of 1978, when Leonel Castillo, then Commissioner of INS, testified before Congress:

> Our independent research indicates that if all of the veterans followed the same mortality rates and so on, that demographically there shouldn't be more than 60,000 to 80,000 *assuming they all wanted to come. . . .*
>
> *[A]nd yet our experience in the aftermath of the 1968 [sic] Filipino War Veterans case is that we've had fewer than 100 applicants, so there really has been no big change. The number has been very, very small.*

*Hearings Before the Subcomm. on Immigration, Citizenship and International Law of the House Comm. on the Judiciary,* 95th Cong., 2d Sess. 273 (1978) (emphasis added). Surely, if the number of petitioners had increased dramatically since 1978, the government would have advised the court of that significant fact.

Moreover, whatever the government's original estimate of the number of eligible Filipino veterans, the government had every incentive to litigate vigorously the issues in *68 Filipinos* and to prosecute an appeal of the adverse trial court judgment. This is not a case where an original suit is followed by an unforeseen action involving much higher stakes. *See Parklane Hosiery,* 439 U.S. at 330, 99 S.Ct. at 651. On the contrary, in *68 Filipinos* the government faced 68 separate naturalization petitions joined together in one action, not a lone veteran seeking citizenship. It should have come as no surprise to the government that

---

10. "Yet the courts now invoke offensive collateral estoppel to hold that the Government is powerless to resist further petitions by Filipino war veterans who may yet number 60,000 to 80,000." Brief for Respondent-Appellant at 20. We assume, although the government does not tell us, that the figures of 60,000–80,000 are based on the INS research referred to by INS Commissioner Castillo in his 1978 testimony to Congress. *See* p. 1327, *infra; Hearings Before*

the *Subcomm. on Immigration, Citizenship and International Law of the House Comm. on the Judiciary,* 95th Cong., 2nd Sess. 272–73 (1978). We note, moreover, that Commissioner Castillo gave no indication in his testimony that those figures were not available to the Solicitor General at the time he decided, on the recommendation of the INS, to withdraw the appeal in *68 Filipinos.*

the effects of Judge Renfrew's decision would reach not only the 68 Filipinos before the court, but all similarly situated Filipino veterans, whatever their number.

■ It is not for this court to speculate on the reason the Solicitor General reversed his position after withdrawing the government's appeal in *68 Filipinos.* We have only the record before us to go on, and that record is bare of any support for the government's proffered explanation that it did not fully appreciate until a later time the implications of Judge Renfrew's decision. We thus conclude that the government had a full and fair opportunity to litigate the issues in *68 Filipinos* and that the government's decision to withdraw its appeal does not make it unfair to estop the government from relitigating the identical issues in an effort to defeat Dr. Mendoza's naturalization petition. *See United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950); *Starker v. U. S.,* 602 F.2d 1341, 1349–50 (9th Cir. 1979); *Winters v. Lavine,* 574 F.2d 46, 62–63 (2nd Cir. 1978); *Continental Can Co. v. Marshall,* 603 F.2d 590, 596 (7th Cir. 1979); *Restatement* (Second) of Judgments § 68.1(a) Comment a (Tent. Draft No. 4, 1977).[11]

### C.

We recognize that the Second Circuit in *Olegario, supra,* recently refused to estop the government from relitigating the constitutional issues decided in *68 Filipinos* and, disagreeing with Judge Renfrew, ruled in favor of the government on the merits.[12] We do not believe, however, that *Olegario* compels reversal of the trial court judgment granting Dr. Mendoza's naturalization petition.[13] As the Ninth Circuit has recently noted, "[t]he fact of inconsistent decisions is a relevant, but not always dispositive, factor to be considered in the exercise of discretion." *Western Oil & Gas v. United States E.P.A.,* 633 F.2d 803, 809 (9th Cir. 1980). *See also Crawford v. Ranger Ins. Co.,* 653 F.2d 1248, 1251–52 (9th Cir. 1981).

■ Inconsistent judgments may render collateral estoppel unfair. In *Parklane Hosiery,* 439 U.S. at 330 n.14, 99 S.Ct. at 651 n.14, the Court recited Professor Currie's famous example of a railroad collision involving 50 passengers. Currie, *Mutuality of Estoppel: Limits of the Bernhard Doctrine,* 9 Stan.L.Rev. 281, 304 (1957). In that example, the railroad wins 25 suits, and a plaintiff wins suit 26. It would be unfair, of course, to estop the railroad in suits 27 through 50 on the basis of the apparently fortuitous jury decision in suit 26. Similarly, in *Commissioner v. Sunnen,* 333 U.S. 591, 599, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948), the Court reasoned that it would be unjust to give collateral estoppel effect to a judgment against taxpayer A in subsequent tax years, while similarly situated taxpayers, not collaterally estopped by the judgment against taxpayer A, are accorded more favorable tax treatment because of a change in the tax law.

---

11. Nor, under the guidelines of *Parklane Hosiery,* do we find other circumstances that warrant relitigation of the issues decided adversely to the government in *68 Filipinos.*

The record gives no indication that in 1975 Dr. Mendoza was aware of the *68 Filipinos* litigation and adopted a "wait and see" attitude in the hope of using a favorable decision as a basis for estopping the government from challenging his petition for naturalization. *See Parklane Hosiery,* 439 U.S. at 329–30, 99 S.Ct. at 650–51.

Furthermore, the government was not required to defend the *68 Filipinos* case in an inconvenient forum, and there are no significant procedural opportunities in this action that were not available in the earlier *68 Filipinos* action. *See Id.,* 439 U.S. at 330–31, 99 S.Ct. at 651–52.

12. The district court, apparently without considering collateral estoppel, had adopted Judge Renfrew's "able opinion" and granted Olegario's petition on the merits. 473 F.Supp. 185, 186 (S.D.N.Y.1979).

13. We note that *Olegario* was not decided until after Judge Lucas issued his order granting Dr. Mendoza's petition in this case; thus, Judge Lucas could not have considered *Olegario* in exercising his discretion to apply collateral estoppel offensively against the government. We find no abuse of discretion on the record before him, however, and conclude that the subsequent inconsistent decision does not require reversal.

■ In this case, there is only one inconsistent judgment, and the inconsistency stems from a conflict between the courts of two circuits, not from an apparently fortuitous jury decision or an intervening statutory change in the law.[14] Any unfairness occasioned by application of collateral estoppel in this case is no greater than the unfairness that results whenever circuits disagree; thus, we do not believe that the existence of an inconsistent second circuit decision outweighs the factors favoring collateral estoppel in this case.

Moreover, we find the Second Circuit's reasoning unpersuasive on the collateral estoppel issue. The Second Circuit accepts, without analysis, the government's characterization of the case as one raising issues of national significance. ("In contrast to *Parklane*, the government is the defendant here, and the case raises important issues of national concern." 629 F.2d at 215.) We recognize that the government is frequently involved in cases raising issues of great public importance, and that in such cases the public interest in permitting the government to relitigate those issues may outweigh the public interest in avoiding needless litigation. We simply do not believe, as appears below, that this is such a case.

### D.

■ The government's final line of argument is that *Parklane Hosiery* should be limited to private litigants. It is by now well settled, however, that collateral estoppel may be invoked against the government, *see Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), and may be invoked not only on issues of fact, but on mixed issues of law and fact or pure issues of law. *See Montana v. U. S., supra; Carr v. District of Columbia*, 646 F.2d 599, 608 (D.C.Cir.1980); *Starker v. U.*

S., 602 F.2d at 1344–48. Moreover, the Ninth Circuit has already approved the use of collateral estoppel offensively against the government. *Hinkle Northwest*, 641 F.2d at 1308–10; *Starker v. U. S.*, 602 F.2d at 1350.

Nonetheless, the Supreme Court has cautioned that "(u)nreflective invocation of collateral estoppel against parties with an ongoing interest in constitutional issues could freeze doctrine in areas of the law where responsiveness to changing patterns of conduct or social mores is critical." *Montana v. U. S.*, 440 U.S. at 163, 99 S.Ct. at 978. Similarly, courts have recognized that, as the institutionalized representative of the public interest, the government is sometimes involved in cases of far-reaching national significance, where the policies of conserving judicial resources and preventing parties from taking a "second bite of the apple" are outweighed by the societal interest in "getting a second opinion." *See American Medical International*, slip op. at 1393–1398; *Western Oil & Gas*, 633 F.2d at 809–10; *Porter & Dietsch Inc. v. FTC*, 605 F.2d 294, 299–300 (7th Cir. 1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980). The Restatement (Second) of Judgments, § 68.1(e) (Tent. Draft No. 4, 1977), for example, states that issue preclusion is inapplicable where "there is a clear and convincing need for a new determination of the issue (1) because of the potential adverse impact of the determination on the public interest...."

■ We find no "critical" need for redetermination of the Filipino war veterans' rights. Despite the government's rhetoric, the record is devoid of evidence that Judge Renfrew's decision in *68 Filipinos* has had, or can be expected to have, any significant effect on the number of veterans who become United States citizens.[15] Moreover,

14. Moreover, *68 Filipinos* was litigated in the courts of the Ninth Circuit. Whatever the value of permitting another circuit to take a fresh look at the legal issue involved, thereby perhaps facilitating Supreme Court review, *see American Medical International Inc. v. Secretary of HEW*, 677 F.2d 118, at —————— (D.C.Cir.1981), we think these policies lose

much of their force in a case brought in the same circuit as the initial litigation. *See Starker v. U. S.*, 602 F.2d at 1348–49 n.5.

15. Moreover, it is a significant limiting factor that the "legal matter raised in the second

even if the number of Filipino veterans petitioning for naturalization on the basis of *68 Filipinos* were larger than the record would indicate, we can discern no compelling public interest in opposing the naturalization of those veterans. The persons who may take advantage of *68 Filipinos* are World War II veterans who are likely to be well over 60 years of age; they fought side-by-side with United States troops in the Pacific, and many, like Dr. Mendoza, suffered imprisonment by the Japanese and survived the notorious Bataan Death March. In appreciation for their sacrifices, Congress voted to admit those veterans to United States citizenship over 30 years ago. As former INS Commissioner Castillo observed in his testimony to Congress concerning the Solicitor General's decision to withdraw the appeal in *68 Filipinos*: "[i]t seem[s] . . . that just as a matter of simple justice, that we should honor our commitment to people that we agreed to naturalize thirty years ago." *Hearings Before the Subcomm. on Immigration, Citizenship and International Law, supra,* at 272.

In light of the foregoing analysis, we hold that the district court did not abuse its discretion in estopping the government from relitigating, in opposition to Dr. Mendoza's petition for naturalization, the constitutional issues decided in *68 Filipinos.*

The judgment is AFFIRMED.

proceeding ... involve[s] the same set of events" as that involved in the first. *Commissioner v. Sunnen,* 333 U.S. 591, 601–602, 68 S.Ct. 715, 721–92, 92 L.Ed. 898 (1948); *see United States v. Moser,* 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924), *explained in Montana v. U. S.,* 440 U.S. at 162–63, 99 S.Ct. at 978. Both the facts giving rise to Dr. Mendoza's cause of action and the underlying claims are the same as those in *68 Filipinos.* While we therefore have no occasion to decide whether the government could be estopped from relitigating legal issues determined in *68 Filipinos* in a subsequent case involving a different cause of action, we note that factors favoring relitigation would assume greater weight in a new factual setting. *See Montana v. U. S.,* 440 U.S. at 162–63, 99 S.Ct. at 978.