# UNITED STATES *v.* MENDOZA

No. 82–849.   Argued November 2, 1983—Decided January 10, 1984

*Deputy Solicitor General Geller* argued the cause for the United States. With him on the briefs were *Solicitor General Lee* and *Joshua I. Schwartz*.

*Donald L. Ungar* argued the cause for respondent. With him on the brief was *Lawrence N. DiCostanzo*.

JUSTICE REHNQUIST delivered the opinion of the Court.

In 1978 respondent Sergio Mendoza, a Filipino national, filed a petition for naturalization under a statute which by its terms had expired 32 years earlier.[1] Respondent's claim for naturalization was based on the assertion that the Government's administration of the Nationality Act denied him due process of law. Neither the District Court nor the Court of Appeals for the Ninth Circuit ever reached the merits of his claim, because they held that the Government was collaterally estopped from litigating that constitutional issue in view of an earlier decision against the Government in a case brought by other Filipino nationals in the United States District Court for the Northern District of California. We hold that the United States may not be collaterally estopped on an issue such as this, adjudicated against it in an earlier lawsuit brought by a different party. We therefore reverse the judgment of the Court of Appeals.

---

[1] Mendoza sought naturalization pursuant to §§ 701–705 of the Nationality Act of 1940, 54 Stat. 1137, added by the Second War Powers Act, 1942, 56 Stat. 182, as amended, 8 U. S. C. §§ 1001–1005 (1940 ed., Supp. V).

156

The facts bearing on respondent's claim to naturalization are not in dispute. In 1942 Congress amended the Nationality Act, § 701 of which provided that noncitizens who served honorably in the Armed Forces of the United States during World War II were exempt from some of the usual requirements for nationality. In particular, such veterans were exempt from the requirement of residency within the United States and literacy in the English language. Congress later provided by amendment that all naturalization petitions seeking to come under § 701 must be filed by December 31, 1946. Act of Dec. 28, 1945, § 202(c), 59 Stat. 658. Section 702 of the Act provided for the overseas naturalization of aliens in active service who were eligible for naturalization under § 701 but who were not within the jurisdiction of any court authorized to naturalize aliens. In order to implement that provision, the Immigration and Naturalization Service from 1943 to 1946 sent representatives abroad to naturalize eligible alien servicemen.

Respondent Mendoza served as a doctor in the Philippine Commonwealth Army from 1941 until his discharge in 1946. Because Japanese occupation of the Philippines had made naturalization of alien servicemen there impossible before the liberation of the Islands, the INS did not designate a representative to naturalize eligible servicemen there until 1945. Because of concerns expressed by the Philippine Government to the United States, however, to the effect that large numbers of Filipinos would be naturalized and would immigrate to the United States just as the Philippines gained their independence, the Attorney General subsequently revoked the naturalization authority of the INS representative. Thus all naturalizations in the Philippines were halted for a 9-month period from late October 1945 until a new INS representative was appointed in August 1946.

Respondent's claim for naturalization is based on the contention that that conduct of the Government deprived him of due process of law in violation of the Fifth Amendment to the United States Constitution, because he was present in the

Philippines during part, but not all, of the 9-month period during which there was no authorized INS representative there. The naturalization examiner recommended denial of Mendoza's petition, but the District Court granted the petition without reaching the merits of Mendoza's constitutional claim. The District Court concluded that the Government could not relitigate the due process issue because that issue had already been decided against the Government in *In re Naturalization of 68 Filipino War Veterans*, 406 F. Supp. 931 (ND Cal. 1975) (hereinafter *68 Filipinos*), a decision which the Government had not appealed.[2]

Noting that the doctrine of nonmutual offensive collateral estoppel has been conditionally approved by this Court in *Parklane Hosiery Co. v. Shore*, 439 U. S. 322 (1979), the

---

[2] In *68 Filipinos*, the District Court considered the naturalization petitions of 68 Filipino World War II veterans filed pursuant to §§ 701–702 of the Nationality Act. Fifty-three of those veterans, whom the District Court designated as Category II veterans, like Mendoza, had made no effort to become naturalized before the expiration of the statutory provisions. Like Mendoza, they claimed that the failure of the United States to station an INS representative in the Philippines for the entire period of time in which rights under § 702 were available to them discriminated against Filipinos as a class. Rejecting the Government's arguments that *INS v. Hibi*, 414 U. S. 5 (1973) *(per curiam)*, was controlling, that the issue was nonjusticiable, and that petitioners were not protected by the Federal Constitution during the period at issue, the court applied strict scrutiny to petitioners' claim and held that the Government had not offered sufficient justification for its conduct. 406 F. Supp., at 940–951.

Although the Government initially docketed an appeal from that decision, the Court of Appeals granted the Government's motion to withdraw the appeal on November 30, 1977. The Government made that motion after a new administration and a new INS Commissioner had taken office. Eventually the Government reevaluated its position and decided to take appeals from all orders granting naturalization to so-called Category II petitioners, with the exception of orders granting naturalization to petitioners who filed petitions prior to the withdrawal of the appeal in *68 Filipinos*. Brief for United States 11–12, and n. 13; *Olegario v. United States*, 629 F. 2d 204, 214 (CA2 1980), cert. denied, 450 U. S. 980 (1981). Mendoza's petition for naturalization was filed after the Government withdrew its appeal in *68 Filipinos*.

Court of Appeals concluded that the District Court had not abused its discretion in applying that doctrine against the United States in this case. 672 F. 2d 1320, 1322 (1982). The Court of Appeals rejected the Government's argument that *Parklane Hosiery* should be limited to private litigants. Although it acknowledged that the Government is often involved in litigating issues of national significance where conservation of judicial resources is less important than "getting a second opinion," it concluded that litigation concerning the rights of Filipino war veterans was not such a case. 672 F. 2d, at 1329–1330. For the reasons which follow, we agree with the Government that *Parklane Hosiery*'s approval of nonmutual offensive collateral estoppel is not to be extended to the United States.

Under the judicially developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation. *Montana* v. *United States*, 440 U. S. 147, 153 (1979). Collateral estoppel, like the related doctrine of res judicata,[3] serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen* v. *McCurry*, 449 U. S. 90, 94 (1980). In furtherance of those policies, this Court in recent years has broadened the scope of the doctrine of collateral estoppel beyond its common-law limits. *Ibid.* It has done so by abandoning the requirement of mutuality of parties, *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313 (1971), and by conditionally approving the

---

[3] Under res judicata, a final judgment on the merits bars further claims by parties or their privies on the same cause of action. *Montana* v. *United States*, 440 U. S., at 153; *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 326, n. 5 (1979). The Restatement of Judgments speaks of res judicata as "claim preclusion" and of collateral estoppel as "issue preclusion." Restatement (Second) of Judgments § 27 (1982).

"offensive" use of collateral estoppel by a nonparty to a prior lawsuit. *Parklane Hosiery, supra.*[4]

In *Standefer* v. *United States*, 447 U. S. 10, 24 (1980), however, we emphasized the fact that *Blonder-Tongue* and *Parklane Hosiery* involved disputes over private rights between private litigants. We noted that "[i]n such cases, no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue, and [that] there is no sound reason for burdening the courts with repetitive litigation." 447 U. S., at 24. Here, as in *Montana* v. *United States, supra,* the party against whom the estoppel is sought is the United States; but here, unlike in *Montana,* the party who seeks to preclude the Government from relitigating the issue was not a party to the earlier litigation.[5]

We have long recognized that "the Government is not in a position identical to that of a private litigant," *INS* v. *Hibi*, 414 U. S. 5, 8 (1973) *(per curiam),* both because of the geographic breadth of Government litigation and also, most importantly, because of the nature of the issues the Government litigates. It is not open to serious dispute that the Government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity; in 1982, the United States was a party to more than 75,000 of

---

[4] Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. Defensive use of collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against the same or a different party. *Parklane Hosiery, supra,* at 326, n. 4.

[5] In *Montana* we held that the Government was estopped from relitigating in federal court the constitutionality of Montana's gross receipts tax on contractors of public construction firms. That issue had previously been litigated in state court by an individual contractor whose litigation had been totally financed and controlled by the Federal Government. *Montana* v. *United States, supra,* at 151, 155; see n. 9, *infra.*

the 206,193 filings in the United States District Courts. Administrative Office of the United States Courts, Annual Report of the Director 98 (1982). In the same year the United States was a party to just under 30% of the civil cases appealed from the District Courts to the Court of Appeals. *Id.*, at 79, 82. Government litigation frequently involves legal questions of substantial public importance; indeed, because the proscriptions of the United States Constitution are so generally directed at governmental action, many constitutional questions can arise only in the context of litigation to which the Government is a party. Because of those facts the Government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues.

A rule allowing nonmutual collateral estoppel against the Government in such cases would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue. Allowing only one final adjudication would deprive this Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari. See *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112, 135, n. 26 (1977); see also *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). Indeed, if nonmutual estoppel were routinely applied against the Government, this Court would have to revise its practice of waiting for a conflict to develop before granting the Government's petitions for certiorari. See this Court's Rule 17.1.

The Solicitor General's policy for determining when to appeal an adverse decision would also require substantial revision.[6] The Court of Appeals faulted the Government in this case for failing to appeal a decision that it now contends is

---

[6] The Attorney General has delegated discretionary authority to the Solicitor General to determine when to appeal from a judgment adverse to the interests of the United States. 28 CFR § 0.20(b) (1983).

erroneous. 672 F. 2d, at 1326–1327. But the Government's litigation conduct in a case is apt to differ from that of a private litigant. Unlike a private litigant who generally does not forgo an appeal if he believes that he can prevail, the Solicitor General considers a variety of factors, such as the limited resources of the Government and the crowded dockets of the courts, before authorizing an appeal. Brief for United States 30–31. The application of nonmutual estoppel against the Government would force the Solicitor General to abandon those prudential concerns and to appeal every adverse decision in order to avoid foreclosing further review.

In addition to those institutional concerns traditionally considered by the Solicitor General, the panoply of important public issues raised in governmental litigation may quite properly lead successive administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue. While the Executive Branch must of course defer to the Judicial Branch for final resolution of questions of constitutional law, the former nonetheless controls the progress of Government litigation through the federal courts. It would be idle to pretend that the conduct of Government litigation in all its myriad features, from the decision to file a complaint in the United States district court to the decision to petition for certiorari to review a judgment of the court of appeals, is a wholly mechanical procedure which involves no policy choices whatever.

For example, in recommending to the Solicitor General in 1977 that the Government's appeal in *68 Filipinos* be withdrawn, newly appointed INS Commissioner Castillo commented that such a course "would be in keeping with the policy of the [new] Administration," described as "a course of compassion and amnesty." Brief for United States 11. But for the very reason that such policy choices are made by one administration, and often reevaluated by another administration, courts should be careful when they seek to apply expanding rules of collateral estoppel to Government litiga-

tion. The Government of course may not now undo the consequences of its decision not to appeal the District Court judgment in the *68 Filipinos* case; it is bound by that judgment under the principles of res judicata. But we now hold that it is not further bound in a case involving a litigant who was not a party to the earlier litigation.

The Court of Appeals did not endorse a routine application of nonmutual collateral estoppel against the Government, because it recognized that the Government does litigate issues of far-reaching national significance which in some cases, it concluded, might warrant relitigation. But in this case it found no "record evidence" indicating that there was a "crucial need" in the administration of the immigration laws for a redetermination of the due process question decided in *68 Filipinos* and presented again in this case. 672 F. 2d, at 1329–1330. The Court of Appeals did not make clear what sort of "record evidence" would have satisfied it that there *was* a "crucial need" for redetermination of the question in this case, but we pretermit further discussion of that approach; we believe that the standard announced by the Court of Appeals for determining when relitigation of a legal issue is to be permitted is so wholly subjective that it affords no guidance to the courts or to the Government. Such a standard leaves the Government at sea because it cannot possibly anticipate, in determining whether or not to appeal an adverse decision, whether a court will bar relitigation of the issue in a later case. By the time a court makes its subjective determination that an issue cannot be relitigated, the Government's appeal of the prior ruling of course would be untimely.

We hold, therefore, that nonmutual offensive collateral estoppel simply does not apply against the Government in such a way as to preclude relitigation of issues such as those involved in this case.[7] The conduct of Government litigation in

---

[7] The Government does not base its argument on the exception to the doctrine of collateral estoppel for "unmixed questions of law" arising in "successive actions involving unrelated subject matter." *Montana* v.

the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the Government. We think that our conclusion will better allow thorough development of legal doctrine by allowing litigation in multiple forums. Indeed, a contrary result might disserve the economy interests in whose name estoppel is advanced by requiring the Government to abandon virtually any exercise of discretion in seeking to review judgments unfavorable to it. The doctrine of res judicata, of course, prevents the Government from relitigating the same cause of action against the parties to a prior decision,[8] but beyond that point principles of nonmutual collateral estoppel give way to the policies just stated.

Our holding in this case is consistent with each of our prior holdings to which the parties have called our attention, and which we reaffirm. Today in a companion case we hold that the Government may be estopped under certain circumstances from relitigating a question when the parties to the two lawsuits are the same. *United States* v. *Stauffer Chemical Co., post*, p. 165; see also *Montana* v. *United States*, 440 U. S. 147 (1979); *United States* v. *Moser*, 266 U. S. 236 (1924). None of those cases, however, involve the effort of a party to estop the Government in the absence of mutuality.

The concerns underlying our disapproval of collateral estoppel against the Government are for the most part inappli-

_____

*United States*, 440 U. S., at 162; see *United States* v. *Stauffer Chemical Co., post*, p. 165; *United States* v. *Moser*, 266 U. S. 236, 242 (1924). Our holding in no way depends on that exception.

[8] In *Nevada* v. *United States*, 463 U. S. 110 (1983), we applied principles of res judicata against the United States as to one class of claimants who had not been parties to an earlier adjudication, *id.*, at 143–144, but we recognized that this result obtained in the unique context of "a comprehensive adjudication of water rights intended to settle once and for all the question of how much of the Truckee River each of the litigants was entitled to." *Id.*, at 143.

cable where mutuality is present, as in *Stauffer Chemical*, *Montana*,[9] and *Moser*. The application of an estoppel when the Government is litigating the same issue with the same party avoids the problem of freezing the development of the law because the Government is still free to litigate that issue in the future with some other party. And, where the parties are the same, estopping the Government spares a party that has already prevailed once from having to relitigate—a function it would not serve in the present circumstances. We accordingly hold that the Court of Appeals was wrong in applying nonmutual collateral estoppel against the Government in this case. Its judgment is therefore

*Reversed.*

---

[9] In *Montana* an individual contractor brought an initial action to challenge Montana's gross receipts tax in state court, and the Federal Government brought a second action in federal court raising the same challenge. The Government totally controlled and financed the state-court action; thus for all practical purposes, there was mutuality of parties in the two cases. "[T]he United States plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation," 440 U. S., at 155, to be constituted a "party" in all but a technical sense.