**Michael VAN METER, Plaintiff,**

v.

**William P. BARR, Defendant.**

**Civ. A. No. 91–0027.**

United States District Court, District of Columbia.

Oct. 23, 1992.

Jack Lipson, Arnold & Porter, Washington, D.C., David Kairys, Kairys & Rudovsky, Philadelphia, Pa., Joseph M. Sellers, Elizabeth A. Singer, Washington Lawyers' Comm. for Civil Rights Under Law, Washington, D.C., Steven A. Berliner, Arnold & Porter, Los Angeles, Cal., for plaintiff.

Robert S. Whitman, Civil Div., Federal Programs Branch, Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM

GESELL, District Judge.

Plaintiff, a Special Agent of the Federal Bureau of Investigation ("FBI"), brought this action alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17. Having concluded that Special Agent ("SA") Van Meter was not entitled to a jury trial under the provisions of the Civil Rights Act of 1991, *Van Meter v. Barr*, 778 F.Supp. 83 (1991), a brief bench trial was completed on September 15 and 16, 1992. After consideration of oral argument and post-trial briefs, the Court makes the following findings of fact and enters its conclusions of law.

## I. Background

Although this case has a long and somewhat acrimonious pretrial history involving, among other things, numerous motions and discovery disputes, when it finally came to trial the remaining factual and legal issues proved to be extremely narrow. Several claims were abandoned. It is necessary at the outset to place the remaining issues in their proper context by summarizing certain mostly undisputed background facts.

When SA Van Meter entered his duties as an FBI Special Agent, he was already divorced. His children lived with his former wife in Dayton, Ohio. He had visited his children and kept in close contact with them. He was initially assigned to Seattle, Washington. After he successfully completed this assignment, he was ordered to report to Los Angeles. It was the practice of the Bureau at the start of a new agent's career to assign the agent to a major city like Los Angeles following completion of the initial duty assignments. The decision to send SA Van Meter to Los Angeles was made in the regular course by the personnel office and is not claimed to have been racially discriminatory in any way.

At this career stage, an agent may express a preference for a particular major city. SA Van Meter had stated his preference for a mid-western city, which would have made him more readily available to

his children, but his preference had not been favorably met and he protested on hardship grounds in an entirely appropriate and proper manner. This protest was denied.

Thereafter, SA Van Meter completed his transfer from Seattle to Los Angeles and did not appeal the denial of his preference on hardship grounds, as he could have done pursuant to then-existing FBI regulations.

SA Van Meter is still stationed in Los Angeles. He has served effectively in all respects. He complains of no action taken by his superiors in that office and does not allege discrimination by any of them.

SA Van Meter is black. During his early training he developed a casual acquaintance with another new black Special Agent named Donald Rochon. SA Rochon had been initially assigned to Omaha about the same time that SA Van Meter was assigned to Seattle. After completing his Omaha assignment, SA Rochon was ordered to transfer from Omaha to Chicago. For family and other personal reasons, this transfer was contrary to SA Rochon's strong preference for Los Angeles. Thus at about the same time, in 1984, these two men with apparently identical qualifications had transfer orders from their initial assignments to major cities other than the city each preferred.

Like SA Van Meter, SA Rochon filed a protest indicating his desire to be near his parents in Los Angeles. His hardship request was also denied by the personnel office. Unlike SA Van Meter, however, SA Rochon took an appeal in his case to the Hardship Transfer Review Board. SA Rochon's appeal was denied by the Board.

Subsequent to these events, SA Rochon brought an administrative discrimination case. He alleged a litany of racially discriminatory acts and injuries perpetrated upon him by white Special Agents and superiors while he was at Omaha and includ-

ed as an example of such discrimination, among many others, the fact that he had been assigned to Chicago after he had strongly indicated his personal reasons for not wanting to work in that city, some of which were racial.[1] Eventually, after a full EEOC hearing, findings of fact and judgment in SA Rochon's favor demonstrated that he had been a victim of gross, persistent racial discrimination affecting both his work in Omaha and his assignment to Chicago. The Department of Justice accepted the EEOC decision and is bound by the findings with respect to SA Rochon.

SA Van Meter was not a party to SA Rochon's appeal before the Hardship Transfer Review Board or the EEOC hearing. Indeed, he declined to testify in the EEOC proceedings when requested by SA Rochon. However, SA Van Meter had informally suggested to SA Rochon a swap idea that could be presented to the Hardship Transfer Review Board under which SA Rochon would go to Los Angeles where SA Van Meter worked, and SA Van Meter would take SA Rochon's assignment to Chicago, thus placing SA Van Meter closer to his children in Dayton and awarding SA Rochon his preference. SA Rochon accepted this idea and included it in support of his appeal seeking transfer to Los Angeles. *See* Plaintiff's Exhibit 15. There is no official or unofficial FBI procedure that authorizes, tolerates or recognizes a swap of assignments initiated by special agents for their personal convenience.

The crucial dates of the events described above, and which will be pertinent in later discussion of the issues, are set forth below in their chronological sequence.

Spring of 1984 SA Van Meter was transferred from Seattle to Los Angeles.

March 9, 1984 SA Van Meter requested reconsideration of that transfer order.

---

1. The Special Agent who participated most in SA Rochon's harassment in Omaha had been sent to Chicago shortly before SA Rochon's transfer there was announced. This man's presence in the Chicago office made that location particularly undesirable for SA Rochon. The Omaha supervisors were aware of the animosity between the two men, which included the agent's spreading false and demeaning rumors about SA Rochon. SA Rochon's supervisors knew that his placement in the same office with this agent would pose great difficulties for SA Rochon when he arrived in Chicago.

April 3, 1984 SA Van Meter's request was denied.

May 4, 1984 SA Rochon appealed to the Hardship Transfer Review Board the denial of a hardship protest he had made on March 12, 1984. As part of this appeal, SA Rochon mentioned the swap arranged between the two agents, asking that his Chicago assignment and Van Meter's Los Angeles assignment be reversed.

May 23, 1984 SA Rochon's appeal was denied.

January 8, 1986 SA Rochon filed a formal complaint with the EEOC.

December 16 to December 19, 1986 Formal proceedings were held in Rochon's EEOC case.

June 26, 1987 EEOC decision in Rochon's favor was released.

August 6, 1987 The Department of Justice issued its final decision in the matter, adopting the EEOC decision.

August 1987 SA Van Meter learned of the EEOC findings in Rochon's case.

September 3, 1987 SA Van Meter consulted with an EEOC counselor.

October 1987 SA Van Meter filed an EEOC complaint.

December 7, 1990 SA Van Meter's EEOC complaint was dismissed as untimely.

January 7, 1991 SA Van Meter filed the initial complaint in this case.

## II. Issues

Two basic issues control the result of this case: first, whether SA Van Meter has met the timeliness requirement for his claim; and second, whether he has demonstrated injury from race discrimination as a matter of fact and law. These issues are discussed below.

### A. Timeliness

█ Since SA Van Meter did not initiate his administrative complaint until September 1987 contending that the FBI's failure in April 1984 to assign him to Chicago was discriminatory, he requests that the provisions of the Title VII statute of limitations, 42 U.S.C. § 2000e–16(c), be tolled in his favor. The Department of Justice opposes and SA Van Meter has the burden of proof. If SA Van Meter prevails on this issue, he will still have the ultimate burden of demonstrating injury from race discrimination as a matter of fact or law.

The Court finds there is ample factual basis for tolling the time within which SA Van Meter was reasonably justified in filing an administrative complaint to the date he filed. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Loe v. Heckler*, 768 F.2d 409, 418–19 (D.C.Cir.1985).

The mere fact that SA Van Meter was denied transfer from Seattle to a major city of his preference did not raise any ground to suspect race discrimination. He was entitled to a major city, but not a city of his choice. Other agents did not always get their choices. Preferences were not guaranteed. Indeed, at time of employment the FBI obliges all new agents, including SA Van Meter, to certify in writing that they agree to work wherever assigned, regardless of personal desire or family, as the needs of the Service require.

It is equally uncontroverted and even more significant that SA Van Meter himself acknowledged unequivocally at trial that he was well and fairly treated in Los Angeles and never sensed any form of racial discrimination directed at him. He had heard rumors of racial problems at some other offices, but found no fault with the Los Angeles office and experienced a successful career.

The Department rests its opposition to tolling almost entirely on SA Van Meter's relationship with SA Rochon. The Court has examined this relationship with care, confined, of course, by the actual proof.

Special Agents Van Meter and Rochon were not close friends. They were both black and became marginally acquainted during initial training before SA Van Meter went to Seattle and SA Rochon to Omaha. Unlike SA Van Meter, SA Rochon was subjected to oppressive, continuous racial discrimination at Omaha. While SA Van Meter accepted the denial of his transfer request and did not appeal, SA Rochon mounted a vigorous attack on his denial,

claiming the conditions he encountered in Omaha had influenced his assignment to Chicago. SA Van Meter was not a party to the proceedings that resulted from this attack.

As SA Rochon first pursued his appeal before the Hardship Transfer Review Board he attempted to involve SA Van Meter. The two men talked back and forth by telephone a few times. The record is murky, to say the least, as to the substance and detail of these contacts. During pretrial and trial SA Van Meter made statements that weakened the credibility of his final version, according to which he understood that SA Rochon believed the denial of the appeal to have been racially discriminatory,[2] though he did not agree with SA Rochon's suspicions. The record also includes a positive indication that SA Van Meter learned at a very early stage of the racial difficulties SA Rochon was experiencing in Omaha—a situation quite different from his experience at Los Angeles.[3]

SA Rochon asked SA Van Meter to cooperate in his discrimination case and to testify at the EEOC hearing. SA Van Meter refused both suggestions, saying he had no proof that there had been any discrimination. SA Van Meter still felt the Personnel Office had turned down his preference for legitimate reasons.

There is no proof that SA Rochon told SA Van Meter of any facts that would cause SA Van Meter to believe he was transferred to Los Angeles, against his preference, for discriminatory reasons. The most SA Van Meter knew about the transfer issue was that SA Rochon believed his transfer to Chicago was a continuation of the race harassment he had experienced in Omaha. However, it stretches inferences too far to imply that SA Van Meter learned facts from SA Rochon that would establish racial discrimination by the Headquarters Personnel Office or the Hardship Transfer Review Board. Thus the Court finds that SA Van Meter only had notice sufficient to trigger the statute's requirements as to himself when he received the findings of fact in SA Rochon's case. Plaintiff's Exhibit 1, EEOC Statement of Findings and Recommended Decision in the Discrimination Complaint of Donald Rochon; Plaintiff's Exhibit 2, Dep't of Justice Final Decision in the matter of *Rochon v. Federal Bureau of Investigation.* Thereafter, he acted with sufficient dispatch and the statute is tolled.

**B. Merits**

█ In presenting his race discrimination claim at trial, SA Van Meter relied almost entirely on facts found against the FBI in SA Rochon's EEOC case. He offered no facts from his own experience as a Special Agent in support of his contention that his assignment from Seattle to Los Angeles was racially motivated. SA Van Meter rests his case on the merits upon a legal theory. He contends that the FBI is bound by the findings in SA Rochon's EEOC case and that these findings estab-

---

**2.** At trial, plaintiff testified that SA Rochon advised him in a telephone conversation at the time of the denial of his appeal to the Board that Rochon thought the denial of the swap was racially motivated (Transcript at 32–33). Plaintiff's Amended Complaint reads somewhat differently: "SAC Hawkins informed Special Agent Rochon, who then informed plaintiff, that the requested transfer exchange was denied on the basis of usual FBI policy and that nothing unusual or untoward had occurred." First Amended Complaint, ¶ 13. Van Meter's declaration submitted in response to defendant's summary judgment motion states: "Special Agent Rochon informed me that, according to his Special Agent in Charge in Omaha, the May 4 transfer request was denied on the basis of usual FBI policy." Declaration of Michael Van Meter, April 8, 1991, ¶ 3. In addition, there is some evidence that SA Van Meter heard more about

SA Rochon's allegations of discrimination from a phone call with SA Rochon at some time around December 1986, when SA Rochon was preparing for his EEOC hearing. When SA Rochon asked SA Van Meter to testify at that hearing, SA Van Meter declined, stating that he did not see that the denial of the swap request had anything to do with discrimination. As SA Rochon recalled, "I remember [SA Van Meter's] viewpoint was that there was no evidence.... He had no idea what was going on." Deposition of Donald Rochon at 71, 74.

**3.** SA Van Meter testified during his deposition about a 1984 conversation with Don Leighton, who informed SA Van Meter about the harassment of SA Rochon in Omaha. *See* Transcript at 103–104.

lish that the proposed swap with SA Rochon was denied because the Hardship Transfer Review Board's action was found to be discriminatory as to SA Rochon.[4]

SA Van Meter was not a party to these proceedings. He urges the Court, however, to accept the findings as binding on the FBI, citing *Rochon v. Attorney General*, 710 F.Supp. 377, 379 (D.D.C.1989). That case properly held the findings to be binding with respect to further action in SA Rochon's case. The question is open as to whether or not the findings bind the FBI for purposes of this case.

■ The government rightly argues that it is not collaterally estopped by the findings. Counsel for SA Van Meter seeks to apply offensive collateral estoppel to avoid relitigation of the EEOC findings, which were claimed as binding with respect to SA Van Meter. Contrary to plaintiff's position, however, the government is not collaterally estopped by prior findings when the issue is raised in subsequent litigation between different parties. *United States v. Mendoza*, 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984); *American Fed'n of Gov't Employees v. Federal Labor Relations Authority*, 835 F.2d 1458, 1462 (D.C.Cir.1987) (collateral estoppel applies against government only where mutuality of parties exists). There was no mutuality of parties here as previously indicated by SA Van Meter's pleadings. SA Van Meter refused to become involved in SA Rochon's case at any level and failed even to take an appeal of his protest, and thus was not even eligible to join in SA Rochon's appeal before the Board.

Despite vigorous arguments from both sides on the collateral estoppel issue, its resolution in favor of the defendant has little impact on SA Van Meter's overall case. There is no reason to question the EEOC findings that SA Rochon's appeal of his transfer request was denied for discriminatory reasons. These findings are limited to two statements. First, the EEOC

Statement of Findings included the following:

> [The] Agency's [FBI's] decision to transfer Complainant [Rochon] to Chicago in March 1984, and to deny Complainant's request for a change in that transfer in May 1984 were adverse actions to Complainant and were sufficiently close in time to the other actions ... described above to infer a causal nexus between the protected activity in which Complainant engaged and the adverse actions Complainant experienced.

Plaintiff's Exhibit 1 at 27–28. The Statement's conclusion reads:

> Complainant established by a preponderance of the evidence that the [FBI's] articulated legitimate non-discriminatory reasons for the transfer and the refusal and denial of Complainant's request and appeal for a change of transfer were pretext to mask unlawful discrimination based upon race and color ...

*Id.* at 63. The Court views these conclusions as establishing race discrimination against SA Rochon in the FBI's denial of his hardship transfer appeal.

The heart of SA Van Meter's case is not whether these findings are binding on the FBI, but whether they have any significance when considered in the light of SA Van Meter's claim. He relies on the above findings in SA Rochon's EEOC case to establish indirect injury to himself under Title VII. But SA Van Meter must demonstrate by a preponderance of the evidence from the record as a whole that he was injured as a direct result of the denial of SA Rochon's request. Only then would he have an acceptable discrimination claim against the FBI on the indirect injury theory. *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (endorsing and applying in Title VIII context broad interpretation of Title VII standing endorsed in *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442, 446–47 (3d Cir.1971)); *Gray v. Greyhound Lines,*

---

**4.** SA Van Meter offered as evidence both the EEOC findings of fact and conclusions of law in SA Rochon's case as well as the transcript and exhibits of the hearing itself. The court accepted the former but rejected the latter. The transcript was marked for identification but not received in evidence.

545 F.2d 169, 176 (D.C.Cir.1976) (broadly interpreting Title VII standing to afford black bus drivers a remedy for injuries resulting from discrimination against others).

SA Van Meter's claim of indirect injury must fail because he has not established that he suffered injury as a result of the discrimination against SA Rochon. He has not even made a prima facie case of discrimination, because he cannot show that had SA Rochon's appeal been granted, he would have been transferred to Chicago. The weight of the evidence does not support this conclusion as at all likely under the circumstances prevailing at the time SA Rochon's appeal was considered.

The FBI offered undisputed testimony from Edwin J. Sharp, the Chairman of the Hardship Transfer Review Board, who acted on SA Rochon's appeal but did not testify at the SA Rochon's EEOC hearing. He testified that while the Board had authority to overrule decisions of the Headquarters Personnel Office and could have directed that SA Rochon's appeal be resolved by sending him to Los Angeles to be replaced in Chicago by SA Van Meter, this would not have occurred. Transcript at 210–11, 225–26. He stated unequivocally that he would not have exercised this authority without a separate, thorough examination of SA Van Meter's availability and qualifications. The Court finds this testimony credible. Information concerning SA Van Meter was never presented to the Board because SA Van Meter had never questioned the denial of his transfer and, moreover, the Board had never previously considered or approved a swap. Transcript at 197. Since SA Van Meter never appealed to the Hardship Transfer Review Board, it is most unlikely that the Board would have undertaken an independent review of SA Van Meter's transfer protest on its own merits. The Board was considering SA Rochon's transfer to Chicago. It is not in the business of switching agents.

Chairman Sharp emphasized that no regulation or practice recognizing or establishing any swap procedure existed. There were no findings in SA Rochon's EEOC case on these aspects of the Board's authority and FBI practice. The Hardship Transfer Review Board referred to the swap idea, as plaintiff has asserted, but its reaction to the proposal was unfavorable. The Board found upon cursory review that SA Van Meter's hardship claim "did not merit consideration." Plaintiff's Exhibit 17. This exhibit, an addendum to the Board's decision, reads:

> [SA Rochon's] attempt to inject his own proposal of "swapping" offices of assignment with another Agent for their personal convenience is not sound business practice.

*Id.* At a minimum, Chairman Sharp established to the Court's satisfaction that there would have been no immediate transfer of SA Van Meter in the event of a successful appeal by SA Rochon and that the outcome of SA Van Meter's situation would have depended on many uncertain factors.

For instance, SA Rochon might not have been sent to Los Angeles even if his appeal had been granted. The EEOC findings in SA Rochon's case discuss sending SA Rochon to either Los Angeles or San Francisco. Apparently SA Rochon requested transfer to either of these cities. Plaintiff's Exhibit 1 at 16, 48. The findings also discuss an FBI policy against sending agents to their home cities, *id.* at 34–35, which in SA Rochon's case would have been Los Angeles, where his family was located and where he had been a member of the police force. This "no home" policy has apparently not been documented but seems to have been followed fairly regularly, with a few exceptions, *id.* at 35–36. The policy implies that SA Rochon would have more likely been sent to San Francisco than to Los Angeles in the event of a successful appeal. This result would have failed even to present the swap idea on which SA Van Meter relies, namely that the two agents could have been exchanged.

In sum, the evidence on the record weighs heavily against SA Van Meter's contention that he would have been sent to Chicago had SA Rochon's appeal been granted. This issue clearly was not presented in the EEOC proceeding.

For these reasons, the Court finds that the record as a whole fails to establish a prima facie case of discrimination. Given the lack of evidence that the discrimination against SA Rochon had any impact on SA Van Meter's situation, the defendant must prevail.[5] The Clerk of Court is directed to enter judgment for defendant. Defendant shall have its costs, to be fixed by the Clerk.

---

**5.** SA Van Meter's general reprisal claims were abandoned at trial. SA Van Meter made a discrete claim of reprisal in a motion to file a second amended complaint, filed on November 21, 1991, which alleged excessive discipline imposed on SA Van Meter by FBI Headquarters after he declined a suggested settlement of this case. The Second Amended Complaint was not accepted, and the issue it raised was put aside for separate jury trial. SA Van Meter is represented by different counsel due to a conflict of interest on the part of counsel in this case and the issue is now the subject of a new complaint, filed on October 16, 1992, in Civil Action No. 92-2324.