DAVID L. AND FAGALE D. GRANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grant v. Commissioner
Docket No. 22193-93
United States Tax Court
T.C. Memo 1995-29; 1995 Tax Ct. Memo LEXIS 32; 69 T.C.M. (CCH) 1716; January 24, 1995, Filed *32 Decision will be entered under Rule 155. For petitioners: William B. Sellers. For respondent: Horace Crump. COUVILLION
COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) [1] and Rules 180, 181, and 182. Respondent determined a deficiency of $ 2,340 in petitioners' Federal income tax for 1990. Petitioners conceded one adjustment in the notice of deficiency -- their failure to report $ 84 interest income on their 1990 Federal income tax return. The sole issue for decision is whether the unauthorized distribution of a pension fund during 1990 by the State of Alaska to petitioners' agent, who misappropriated the funds, constitutes the constructive receipt of income by petitioners under section 61(a). Some of the facts were stipulated, and those facts, with the annexed exhibits, are so *33 found and are incorporated herein by reference. Petitioners, husband and wife, were legal residents of Wetumpka, Alabama, at the time they filed their petition. David L. Grant (petitioner) graduated from college in 1981 and worked in Montgomery, Alabama, for approximately 1 year. He was laid off after 1 year and, being unable to find suitable employment, decided to seek employment in the State of Alaska. Petitioners moved to Alaska sometime during 1982. Petitioner found employment with the State in the mental health field. Petitioner resigned his position on December 17, 1989, and he and his wife moved back to Alabama. During his employment with the State of Alaska, petitioner was a participant in two State retirement programs for State employees. One program was the Alaska Supplemental Annuity Plan (the SBS Program), which was a defined contribution annuity plan. This plan was intended to replace Social Security, since State employees were not subject to Social Security coverage. It appears that all contributions to the SBS Program were by employees with no contributions by the State of Alaska. At the time petitioner's employment with the State of Alaska terminated, he *34 had 7.173 years of credited service and had accumulated $ 46,580.63 in his SBS Program account. The other retirement program in which petitioner participated was the State of Alaska Public Employees Retirement System (the PERS Program), which, from the record, appears to have been a qualified government retirement plan under section 414(d). At the time petitioner terminated his employment with the State of Alaska, his account in the PERS Program totaled $ 14,619.64, of which $ 9,309.08 represented contributions by the State of Alaska, and $ 5,310.56 represented petitioner's contributions. Petitioner was vested in the PERS Program. After returning to Alabama, petitioners experienced financial problems in paying approximately $ 30,000 in debts owing to various creditors. Sometime in September 1990, petitioners responded to a local newspaper advertisement by the Innovative Co., which offered "debt consolidation" services. Essentially, this company, for a monthly fee, would contact a person's creditors and procure agreements from them for an arranged schedule for payment of their debts. Once a plan was in place, the debtor would pay a fixed monthly amount to the company, and, in *35 turn, the company, after deducting its fee, would pay each creditor. Petitioners first met with Maurice Bailey, who was owner of the Innovative Co. Mr. Bailey arranged for petitioners to meet with Eddie W. Johnson, Jr. (Mr. Johnson), who was a licensed insurance agent and worked on an independent contract basis for the Innovative Co. Petitioners' two principal assets were their two retirement accounts with the State of Alaska, described above. Petitioners did not want to withdraw their PERS Program account because they knew a withdrawal would result in tax consequences, and petitioner wanted to preserve the account for his retirement. This was made known by petitioners to Mr. Johnson. At Mr. Johnson's suggestion, it was agreed that the SBS Program account could be withdrawn without any tax consequences, and the proceeds could be used to purchase a single premium annuity with an insurance company. Under this annuity, petitioners could immediately borrow 10 percent of their account, which they could use to pay creditors. Petitioners agreed to such a transfer. Mr. Johnson agreed to contact petitioners' creditors to obtain their agreements to a scheduled payment program, which *36 would be administered through the Innovative Co. The necessary forms were obtained from the State of Alaska to accomplish the transfer of what petitioners believed would be their SBS Program account. [2] Mr. Johnson was successful in obtaining agreements from petitioners' creditors for a scheduled payment of their debts. When it became evident that petitioners' SBS Program account would be transferred for the single premium annuity, the Innovative Co. loaned petitioners $ 2,000 in December 1990. Sometime prior thereto, in October 1990, petitioner signed a document that he believed was a request to transfer his SBS Program account to Jackson National Life Insurance Co., the company from which the single payment annuity would be purchased. The form petitioner signed, although it contained his address, also provided that the "permanent contact mailing address" was that of the Innovative Co. Unknown to petitioner, the form he signed was for the withdrawal of his PERS Program account, rather than his SBS Program account. The State of Alaska, however, refused to honor this request for two reasons: The PERS Program account could only be paid directly to its owner, and the consent of *37 petitioner's spouse was necessary. This information was mailed to the "permanent contact mailing address". When it was received, Mr. Johnson contacted petitioner and advised him that Mrs. Grant's consent was necessary. He did not advise petitioner that this involved his PERS Program account, and that the payment would be made payable to petitioner. Mrs. Grant, thereafter, signed the consent, which Mr. Johnson then forwarded to the State of Alaska. On November 16, 1990, the State of Alaska issued a check payable to petitioner in the amount of $ 14,619.64, which was mailed to the Innovative Co. at the "permanent contact mailing address". The check was received in due course by the Innovative Co., it was endorsed on the reverse side "For Deposit Only Innovative Co.", with the purported signature of David L. Grant. Petitioner was never informed of this check, he did not endorse the check, and he never received any of the proceeds of this check. In January 1991, the State of Alaska issued Internal Revenue Service (IRS) Form 1099-R, Statement For Recipients of Total Distributions From Profit Sharing, Retirement Plans, Individual Retirement Arrangements, Insurance Contracts, Etc., *38 which reflected a gross distribution to petitioner during 1990 of $ 14,619.64, of which $ 9,306.08 was taxable, and $ 5,310.56 represented employee contributions. The Form 1099-R was mailed to the "permanent contact mailing address" of the Innovative Co. The Innovative Co. did not forward or advise petitioner of this distribution or of the Form 1099-R. Petitioners' 1990 Federal income tax return was prepared by the Innovative Co. and signed by Maurice Bailey as preparer. The $ 9,309.08 was not included as income on petitioners' 1990 return, nor was it even discussed in the preparation of petitioners' return. Meanwhile, in December 1990, the State of Alaska received from the Innovative Co. an application by petitioner, [3] with an attached spousal consent, for *39 transfer of the $ 46,580.63 SBS Program account. That request was honored by the issuance of a check dated February 6, 1991, which was also mailed to the Innovative Co. The check was subsequently endorsed and made payable to the Jackson National Life Insurance Co. [4] In March 1991, petitioners borrowed 10 percent of their annuity account from Jackson National Life Insurance Co. (the insurance company). This was in accordance with the advice petitioners had received from Mr. Johnson. [5] Petitioners used $ 2,000 of these loan proceeds to pay the $ 2,000 loan they had made with the Innovative Co. in December 1990. Meanwhile, petitioners proceeded with the debt consolidation arrangement that had been worked out by the Innovative Co. After paying credit check and initiation fees totaling $ 208 to the Innovative Co., petitioners, beginning in January 1991, made several monthly payments to the Innovative Co. in accordance with their debt payment plan. Petitioners' first check was in the amount of $ 400, dated January 11, 1991. Petitioners thereafter issued four monthly checks of $ 350 each, and one check of $ 225 on June 14, 1991. Petitioners made no further payments after the $ *40 225 check of June 14, 1991, because of a series of events that began a few months earlier in which the credibility of the Innovative Co. and Mr. Johnson came into question. *41 Approximately 1 month after petitioners had borrowed the $ 4,000 from the insurance company on their annuity, they unexpectedly received a second check of $ 3,900 from the insurance company representing another 10 percent loan on their annuity account. Petitioners had not applied for such a loan, nor was it part of the debt consolidation plan they had worked out with Mr. Johnson. They contacted Mr. Johnson about this, and he advised petitioners that he had made application for the second loan because the first loan application had been lost or misplaced. Petitioners followed his advice by not negotiating the check and leaving it with Mr. Johnson, who would return the original $ 3,900 check to the insurance company. In that way, petitioners would not be charged any interest. Mr. Johnson never returned the check to the insurance company but instead endorsed the check for deposit to the account of the Innovative Co. Petitioners contacted the insurance company and were advised that the $ 3,900 loan had never been paid nor was the check ever returned. While this was going on, petitioners began receiving dunning letters from creditors complaining that the debts owing to them were *42 not being paid in accordance with the debt consolidation arrangement. At this point, petitioners realized they had been fleeced. They instituted civil proceedings against the Innovative Co., Mr. Bailey, and Mr. Johnson, and obtained a money judgment against Mr. Johnson in the amount of $ 6,200. Mr. Bailey and the Innovative Co. were exonerated from liability. Mr. Johnson thereafter filed a proceeding in bankruptcy under chapter 7 of the Bankruptcy Code; however, the bankruptcy court held that the $ 6,200 judgment in favor of petitioners was not dischargeable. Petitioners have never collected anything from Mr. Johnson on their $ 6,200 judgment. [6] Unknown to petitioners at this time was the matter involving the $ 14,619.64 PERS Program distribution by the State of Alaska on November 16, 1990, which was deposited in the Innovative Company's bank account. That eventually came to light, however. Petitioners received a letter from the Memphis, Tennessee, IRS Center, dated February 22, 1993, advising petitioners of a proposed change to their 1990 income tax return to include in income $ 9,309 taxable pension and annuity income resulting from the $ 14,619 pension plan distribution *43 by the State of Alaska during 1990. [7] Respondent thereafter issued the notice of deficiency. Petitioners have never been able to collect the $ 14,619.64 from either Mr. Bailey, Mr. Johnson, or the Innovative Co. That claim is uncollectible. The State of Alaska, moreover, takes the position that the distribution was made based upon a proper application for withdrawal and, therefore, has declined to make petitioners whole on their PERS Program account. Respondent contends that, because the $ 14,619.64 distribution was paid to their agent, petitioners constructively received as income during 1990 the taxable portion of the pension distribution. Petitioners contend *44 they did not constructively receive this income and, therefore, are not taxable on income they never received. Alternatively, petitioners contend that, if they constructively received such income, they are entitled to a theft loss deduction. Respondent agrees petitioners are entitled to a theft loss deduction, but only for the year in which the theft was discovered, which was not 1990. The determinations of respondent in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that respondent's determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 61(a) provides generally that, except as otherwise provided, gross income means all income from whatever source derived, including but not limited to specific sources enumerated in section 61(a). In Rossi v. Commissioner, 41 B.T.A. 734, 738 (1940), this Court held that, as a general rule, the receipt of income by an agent is equivalent to the receipt of such income by the principal under the theory that the principal is in constructive receipt of the income, even if the taxpayer is on the cash basis *45 of accounting. See Alsop v. Commissioner, 290 F.2d 726 (2d Cir. 1961), affg. 34 T.C. 606 (1960). However, in Rossi v. Commissioner, supra, this Court held that this general rule is not applicable where the agent receives and misappropriates funds for his own use, where the principal had no knowledge of such misappropriation, and where the principal received no economic benefit from the misappropriated funds. In Sowell v. Commissioner, 302 F.2d 177 (5th Cir. 1962), revg. T.C. Memo. 1961-115, the Court of Appeals for the Fifth Circuit indicated that, if the principal had no knowledge of the misappropriated funds but, nevertheless, received some economic benefit from the funds, the principal is deemed to have realized a constructive receipt of income. On this record, the Court is satisfied that petitioners have satisfied their burden of proving that they never authorized the agent, Mr. Johnson, or the Innovative Co., to withdraw their $ 14,619.64 PERS Program account with the State of Alaska; that petitioners never knew, until they *46 received a letter from the IRS in 1993, that such account had in fact been distributed by the State of Alaska; and that these funds had been misappropriated by their agent, Mr. Johnson, and the Innovative Co. Respondent argued, however, that petitioners, nevertheless, received economic benefits from their agent because, subsequent to the misappropriation, the agent used petitioners' funds to pay petitioners' debts under the debt consolidation plan. The Court rejects that argument because the only economic benefits petitioners received from such payments came from moneys petitioners paid to Mr. Johnson specifically for payment of their debts. The Court is satisfied from the record that no portion of the $ 14,619.64 was used by Mr. Johnson or the Innovative Co. to pay any of petitioners' debts, nor did petitioners realize any other economic benefit from the misappropriated funds. This case is distinguishable from Donohue v. Commissioner, 323 F.2d 651 (7th Cir. 1963), affg. and modifying 39 T.C. 91 (1962), where the taxpayer's bartender had embezzled moneys from the taxpayer's bar and lounge business. In holding that the *47 taxpayer realized taxable income for the amounts embezzled, the Court of Appeals for the Seventh Circuit stated: "Here the bartender received the money, deposited it in taxpayer's cash register, and used it in taxpayer's business before the embezzlement. Taxpayer was given a definite economic benefit from the receipt of the money prior to its embezzlement." In this case, neither Mr. Johnson nor the Innovative Co. ever credited the embezzled amounts to petitioners' account, nor was any portion of the embezzled amounts used for or on behalf of petitioners. Petitioners received no economic benefits from the $ 14,619.64, which the State of Alaska distributed to petitioners' agent. Petitioners, therefore, did not constructively receive this income. Petitioners are sustained on this issue. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The record is not clear whether these forms were obtained by petitioners, or whether they were requested by Mr. Johnson from the State of Alaska as petitioners' representative. In either event, the information on the forms was prepared by Mr. Johnson.↩
3. The record is not at all clear that petitioner in fact signed the applications with the State of Alaska for withdrawal of the SBS Program and PERS Program accounts. The evidence points to Mr. Johnson's having signed petitioner's name to both applications, and the Court so finds. Regardless of whether petitioner signed both applications, the Court is satisfied that petitioners never intended to withdraw the PERS Program account and never authorized Mr. Johnson to apply for withdrawal of this account.↩
4. There was no testimony at trial as to whether petitioner personally endorsed the check, or whether it was endorsed on his behalf by Mr. Johnson or someone with the Innovative Co. Regardless of who endorsed the check, the proceeds were directed and used in accordance with petitioners' agreement with the Innovative Co. for the purchase of an annuity contract.↩
5. The exact amount of the loan was not established at trial. Petitioners testified that it was approximately $ 4,000.↩
6. Petitioners also contacted various local and State law enforcement agencies about their problem; however, at trial, no criminal or any other type of legal action had been taken against any of the principals involved in this matter.↩
7. The letter also advised petitioners of $ 84 unreported interest income. Petitioners have conceded this adjustment.↩