# United States Tax Court

T.C. Memo. 2023-118

JOSEPH MICHAEL BALINT,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 21452-16L.                     Filed September 25, 2023.

————————

Joseph Michael Balint, pro se.

*Jeremy D. Cameron* and *Mark J. Tober*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*: Pursuant to section 6330(d)(1),[1] petitioner seeks review of the determination of the Internal Revenue Service (IRS) Office of Appeals[2] sustaining a proposed levy to collect federal income tax due for the 2013 and 2014 taxable years. After concessions,[3] the remaining issues for decision are whether (1) petitioner is required to include in his gross income the full amounts of individual retirement account (IRA), pension, and annuity distributions that he reported as income on his

----

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] On July 1, 2019, the Office of Appeals was renamed the Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019). We will use the name in effect at the times relevant to this case, i.e., the Office of Appeals or Appeals.

[3] Petitioner now concedes that the determination for 2013 is correct.

**[*2]** 2014 federal income tax return and (2) Appeals' determination to sustain the proposed levy was an abuse of discretion.

FINDINGS OF FACT[4]

Some of the facts are stipulated and are so found. The parties' Stipulations of Facts and the Exhibits thereto, as well as their Stipulation of Settled Issues, are incorporated herein by this reference. Petitioner resided in Florida when he timely filed his Petition.

Petitioner was incarcerated from December 17, 2013, through January 6, 2015. During 2014 petitioner owned a retirement account with Pershing, LLC (Pershing), and a life insurance policy with Pruco Life Insurance Co. (Pruco).

After his incarceration, in February 2014, petitioner sent his wife, Jacqueline Grimes Balint (Jacqueline), a letter which stated:

> You do need to get power-of-attorney!! ASAP!! Call Glen Abbott & explain the situation. He will help us! And remember, it's confidentia[l] so don[']t be worried. Tell him I want to give you everything! House, cars, motorcycles & my bank accounts—all of them in your name, making me beneficiary! He will know what to do. You need to do this now!! In case something happens to me. And the state can[']t take it when this is all over. Call now!! Meet with him & get it done. I will have to sign, but he will know how to take care of that with me here. Ok!! Now! . . . So you won[']t lose anything [&] you have access to everything. Use this letter if he needs it!

---

[4] Petitioner states on brief that he does not object to respondent's proposed findings of fact except to the extent that they are phrased to favor respondent. Respondent, however, objects to petitioner's proposed findings of fact on the grounds that petitioner's brief fails to include references to the parts of the transcript, exhibits, or other sources relied upon to support petitioner's statements of fact, *see* Rule 151(e)(3), and relies on documents and factual assertions that are not in evidence. We agree with respondent that petitioner's brief fails to comply with Rule 151(e)(3), and we have considered petitioner's brief only to the extent that it consists of argument concerning the applicable law and the factual materials that are part of the record. *See, e.g.*, *Ashkouri v. Commissioner*, T.C. Memo. 2019-95, at *23–24. Our Findings of Fact are accordingly based on respondent's undisputed proposed findings of fact, the parties' Stipulations, the Exhibits we have received in evidence, and the trial transcript.

**[*3]** (Emphasis omitted.) In a second letter he sent to Jacqueline that same month, petitioner wrote:

> Have to get my name off the house title, car & motorcycle titles & trailer too! All that stuff is yours. Not too bad a present?! Please use all wisely as I cannot replace any of it. Once it[']s gone, it[']s gone. . . . I have spent so much of my savings, no complaints! But we can not replace it!! A fixed income for sure. Just be careful.

(Emphasis omitted.)

In March 2014 petitioner spoke to Jacqueline by telephone. He understood from that conversation that his monthly Social Security payments of $1,200 were no longer arriving. Petitioner therefore instructed Jacqueline to go to his attorney, Glen Abbott, to obtain a power of attorney that would allow her to receive $1,200 per month from petitioner's financial planner until he returned home.

Mr. Abbott mailed a letter to petitioner along with a proposed power of attorney (POA). The letter advised petitioner that the POA was "a very powerful document" that "would allow for Jacqueline to handle a wide array of matters for [him]." Petitioner signed the POA on March 19, 2014, while incarcerated. Petitioner signed the POA because he wanted to take care of Jacqueline and was trying to save his marriage.

In the POA, which stated that it was governed by Florida law, petitioner appointed Jacqueline as his agent and granted her "full power and authority to perform any act, power, or duty that I may now or hereafter have and to exercise any right that I now have or may hereafter acquire." Petitioner further authorized Jacqueline to "withdraw . . . money or property deposited with or left in the custody of a financial institution" and to "withdraw benefits from" any retirement plan. In addition petitioner initialed "yes" beside provisions granting Jacqueline "the authority to make gifts of [his] property outright to any person, outright or in trust, or otherwise for the benefit of any person" and stating that it was his "specific intent" to authorize Jacqueline to take certain actions that might otherwise constitute prohibited self-dealing. With respect to self-dealing, the POA stated that

> [Petitioner's] designated agent . . . is authorized to take actions in [his] behalf under the terms of this instrument that may benefit the agent as well as his or her immediate

**[*4]**    family by providing for health, education, maintenance or support; in other words, actions that might otherwise be considered prohibited as self-dealing are specifically authorized under the terms of this instrument for the purpose of tax, financial or estate planning, for [petitioner's] benefit, or for qualifying for public assistance such as Medicaid, Supplemental Security Income or other public assistance programs for which [petitioner] may be eligible.

A few weeks after receiving the POA, on April 8, 2014, Jacqueline used her authority thereunder to withdraw $25,000 from the cash value of petitioner's life insurance policy with Pruco for deposit into the couple's joint checking account. She thereafter transferred the amount in five $5,000 installments between April 8 and April 14 into her own individual accounts. Then on April 14, 2014, she used the POA to effect a distribution of $51,300 from petitioner's IRA account at Pershing into their joint checking account. The following day she transferred $45,000 from the joint checking account into her individual accounts and an additional $2,000 in the same manner one day later. On August 27, 2014, she used the POA to effect a distribution of an additional $34,650 from petitioner's IRA account into their joint checking account and shortly thereafter transferred a total of $31,500 in installments between August 27 and September 2, 2014. On September 25, 2014, she used the POA to withdraw an additional $22,592.57 from the cash value of petitioner's aforementioned life insurance policy that was deposited into the couple's joint checking account, and on the same day she withdrew $22,408.64 from the joint account. She transferred an additional $1,000 to her individual account five days later. On October 2, 2014, she used the POA to effect another $3,927.09 distribution from petitioner's IRA account into the couple's joint checking account, followed by a transfer of $4,000 from the joint account into her individual account. The amounts Jacqueline withdrew from petitioner's life insurance policy and IRA account in 2014 totaled $137,469.66, and the amounts she thereafter transferred to her own individual accounts totaled $130,908.64, a difference of $6,561.02.

Jacqueline used the amounts taken from petitioner's life insurance policy and IRA to move from the couple's residence in Florida to Kentucky, to renovate a house there, to care for her ailing mother, and to pay living expenses.

[*5]    Jacqueline then, sometime in late September 2014 (the exact date not having been established in the record), commenced a proceeding for divorce while petitioner was still incarcerated. Petitioner first learned of Jacqueline's desire for a divorce when he was served with the divorce papers in prison in early October 2014.[5]

Petitioner was released from prison in January 2015. In April 2015 he filed a federal income tax return for 2014. The 2014 return indicated that petitioner's filing status was married filing separately. The return reported the total tax due as $59,862, with a balance due, after accounting for withholding credits, of $34,614.

The gross income reported on petitioner's 2014 return was $223,191, consisting of the following items: (1) taxable interest of $375; (2) taxable IRA distributions of $154,477; (3) taxable distributions from pensions and annuities of $67,078;[6] and (4) taxable Social Security benefits of $1,261.[7]   Petitioner reported the IRA and pensions and annuities distributions as his income, even though he did not believe these amounts were properly taxable to him, because he had received IRS forms reporting them and was concerned that failing to report them could constitute a violation of the terms of his probation. He anticipated being able to resolve the matter with the IRS after filing the return.

Respondent assessed the tax petitioner reported as due on his 2014 return. To collect petitioner's unpaid tax liabilities for 2013 and 2014, respondent sent him a notice of intent to levy. In response petitioner requested a collection due process (CDP) hearing by timely submitting to respondent a Form 12153, Request for a Collection Due Process or Equivalent Hearing, concerning the 2013, 2014, and 2015[8] taxable years. Petitioner did not check any of the boxes on his Form 12153 to indicate that he wished to pursue a collection alternative.

---

[5] The divorce action Jacqueline initiated did not result in the termination of the marriage. Petitioner himself commenced a separate divorce action while this case was pending (discussed *infra*).

[6] Petitioner reported total pension and annuity distributions of $67,162.

[7] Petitioner reported total Social Security benefits of $1,483.

[8] Upon receipt of petitioner's hearing request, the IRS advised him that he was not entitled to a hearing with respect to 2015, since no notice of intent to levy had been sent to him, and no balance was due, with respect to that year. Accordingly, no collection action concerning 2015 is at issue in this case.

**[\*6]**    He did, however, check a box indicating that he wished to make a claim for innocent spouse relief, and he submitted Form 8857, Request for Innocent Spouse Relief, along with his Form 12153. He also attached a written statement to his Form 12153 in which he alleged that Jacqueline had stolen more than $240,000 from his IRA and pension accounts and that he had not received any of those funds.

An Appeals settlement officer (SO) was assigned to conduct petitioner's CDP hearing with respect to 2013 and 2014. The SO sent petitioner a letter in which she described the matters that she would consider during the hearing, requested that petitioner submit a Form 433–A, Collection Information Statement for Wage Earners and Self-Employed Individuals, with supporting documentation, and set a date and time for a telephone conference.

In accordance with the SO's request, petitioner submitted a Form 433–A, along with supporting financial information and an explanatory letter emphasizing his claim that Jacqueline had taken "everything [he] had" and that he had not received any money when she did so. Petitioner participated in the telephone conference as scheduled.

Following the telephone conference, Appeals sent petitioner a notice of determination sustaining the proposed levy. The SO explained in the notice of determination that she had verified that the requirements of applicable law and administrative procedure had been satisfied with respect to the collection of petitioner's unpaid tax liabilities. She concluded that petitioner was ineligible for innocent spouse relief because he and Jacqueline had not filed joint returns for the years at issue and that he had provided insufficient information about the legal action he had taken with respect to Jacqueline's withdrawals from his accounts to warrant any adjustment to the amounts of the underlying tax liabilities.

The SO also noted that because petitioner's position was that Jacqueline should be responsible for paying the underlying liabilities, he had not offered a collection alternative. She therefore concluded that the proposed levy appropriately balanced the need for efficient collection of taxes against the intrusiveness of the collection action.

Petitioner timely filed his Petition for review of the notice of determination. While this case was pending, petitioner filed an action for divorce from Jacqueline in the Circuit Court of Citrus County, Florida (state court). As part of that proceeding, to which respondent

[*7] was not a party, the state court issued an "Order on Husband's Motion for Temporary Relief." The state court concluded therein that petitioner had authorized Jacqueline to withdraw a total of $10,800 from his IRA, which had "directly benefited" him, and that he should thus be liable for the tax due on that income.

The state court also concluded, however, that Jacqueline should be liable for the tax due on an additional $179,296 of income—consisting of a further $89,320 of IRA distributions and $89,976 of life insurance distributions—since petitioner did not receive any financial benefit from those funds and Jacqueline had obtained them without petitioner's knowledge or consent.

OPINION

I.  *Administrative Hearing and Judicial Review*

Section 6331(a) authorizes the Secretary to levy upon property and property rights of a taxpayer who fails to pay the tax due within ten days after notice and demand for payment is made. Before doing so, however, the Secretary must give the taxpayer written notice of his or her right to a hearing. § 6330(a)(1), (b)(1).

During the hearing a taxpayer may raise "any relevant issue," such as a challenge to the appropriateness of the collection action and the possibility of collection alternatives. § 6330(c)(2)(A). A taxpayer may also challenge the existence or amount of the underlying tax liability, but only if the taxpayer did not receive a notice of deficiency with respect to the liability or otherwise have an opportunity to dispute it. § 6330(c)(2)(B). A taxpayer is treated as not having had an opportunity to dispute a liability that is reported as due on a return. *Montgomery v. Commissioner*, 122 T.C. 1, 9 (2004). The Appeals officer who conducts the hearing must then determine whether to uphold the collection action, taking into consideration (1) whether the requirements of applicable law and administrative procedure have been met, (2) any relevant issues raised by the taxpayer, and (3) whether the proposed collection action appropriately balances the need for efficient collection of taxes with the taxpayer's legitimate concern that the collection action be no more intrusive than necessary. § 6330(c)(3).

Pursuant to section 6330(d)(1), this Court has jurisdiction to review the Appeals officer's determination. If the validity of the underlying tax liability is properly at issue, we review the liability determination de novo. *Goza v. Commissioner*, 114 T.C. 176, 181–82

[*8] (2000). We review all other determinations concerning a proposed collection action for abuse of discretion. *Id.* at 182. An abuse of discretion occurs if an Appeals officer issues a determination "arbitrarily, capriciously, or without sound basis in fact or law." *Woodral v. Commissioner*, 112 T.C. 19, 23 (1999).

## II.   *Underlying Tax Liability for 2014*

The underlying tax liability reported on petitioner's 2014 return is properly at issue in this case. Therefore, we review the liability de novo. The taxpayer generally has the burden of proof with respect to the underlying liability. Rule 142(a); *Thompson v. Commissioner*, 140 T.C. 173, 178 (2013).

Petitioner has now conceded that $42,259 of the $154,477 he reported on his 2014 return as taxable IRA distributions is properly taxable to him, leaving $112,218 of the reported amount in dispute. Of the IRA distributions he concedes are taxable, $31,459 was paid by the State of Florida and $10,800 was paid by Pershing. He disputes that any portion of the $67,078 reported on the return as taxable pensions and annuities is taxable to him. Moreover, he has stipulated that he owned the accounts from which the disputed $112,218 of IRA distributions and $67,078 of pensions and annuities (collectively, disputed amounts) were withdrawn.

Petitioner contends that the disputed amounts should not be included in his gross income because Jacqueline breached her fiduciary duty under the POA and he "never gave [her] permission to 'take,'" among other things, his "entire life's savings" of "[o]ver $200,000." In support of his position, petitioner points to sections 709.2114 and 709.2201 of the Florida Statutes, Jacqueline's testimony at trial,[9] bank records substantiating Jacqueline's withdrawals from his IRA and life insurance policy, and the state court's order purporting to determine that Jacqueline solely benefited from, and should be liable for the tax due on, certain amounts withdrawn from petitioner's accounts.

Respondent counters that the state court's findings are not conclusive of any issues in this case because essential elements of res judicata and collateral estoppel are absent. Respondent further contends that the disputed amounts should be included in petitioner's

---

[9] Jacqueline testified to the effect that she used the amounts she took from petitioner's accounts to move and renovate a residence in another state and to support herself and her ailing mother.

**[\*9]** gross income because Jacqueline was authorized to withdraw them from petitioner's accounts pursuant to the POA and petitioner's written and oral instructions. Respondent also contends that withdrawal of the disputed amounts provided an economic benefit to petitioner by allowing him to provide for Jacqueline while he was incarcerated and to avoid losing his assets to creditors.

We agree with respondent that neither the state court's findings of fact concerning the extent to which Jacqueline exclusively benefited from the IRA and life insurance distributions, nor the state court's legal conclusions drawn therefrom, have preclusive effect in this case. We agree with petitioner, however, that the preponderance of the evidence establishes that he did not authorize or benefit from Jacqueline's withdrawal of the disputed amounts, and we consequently hold that the disputed amounts are not includible in petitioner's gross income for 2014.[10]

### A.    *Effect of State Court Order*

The preclusion doctrines of res judicata and collateral estoppel[11] "have the dual purpose of protecting litigants from the burden of relitigating an identical issue and of promoting judicial economy by preventing unnecessary or redundant litigation." *Koprowski v. Commissioner*, 138 T.C. 54, 59 (2012) (quoting *Meier v. Commissioner*, 91 T.C. 273, 282 (1988)).

"Res judicata prevents repetitious suits involving the same cause of action and is rooted in 'considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations.'" *Breland v. Commissioner*, 152 T.C. 156, 160 (2019) (quoting *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948)). "The elements of res judicata are: (1) identity of parties, (2) prior judgment by a court of competent jurisdiction, (3) final judgment on the merits, and (4) the

---

[10] Because we hold that the disputed amounts are not includible in petitioner's income, we need not address whether he is entitled to a theft loss deduction under section 165 as he contends he is in an amendment to the Petition.

[11] Although a party asserting res judicata or collateral estoppel ordinarily must plead it as an affirmative defense, *see* Rule 39, the policies that the preclusion doctrines implicate are sufficiently important that a trial court, or even an appellate court, may raise them sua sponte in appropriate circumstances, *see, e.g.*, *Shurick v. Boeing Co.*, 623 F.3d 1114, 1116 (11th Cir. 2010) (per curiam).

**[\*10]** same cause of action." *Id.* at 160–61 (citing *Hambrick v. Commissioner*, 118 T.C. 348, 351 (2002)).

Collateral estoppel is a narrower doctrine that "precludes litigation of issues in a second cause of action if those issues were actually litigated and necessary to the outcome of the first action." *Id.* at 161 (citing *Hambrick*, 118 T.C. at 353). In order for collateral estoppel to bind a party, the following requirements must be met:

> (1) the issue in the second suit must be identical in all respects with the one decided in the first suit, (2) there must be a final judgment rendered by a court of competent jurisdiction, (3) the party against whom collateral estoppel is invoked must have been a party (or privy to a party) to the prior judgment, (4) the relevant issue must have been actually litigated and the resolution of the issue must have been essential to the prior decision, and (5) controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

*Id.* (citing *Peck v. Commissioner*, 90 T.C. 162, 166–67 (1988), *aff'd*, 904 F.2d 525 (9th Cir. 1990)). Although collateral estoppel traditionally applied only if mutuality of parties was present, the Supreme Court has broadened the doctrine to permit the application of "nonmutual" collateral estoppel in certain circumstances. *See United States v. Mendoza*, 464 U.S. 154, 157–59 (1984). Nonmutual collateral estoppel can apply, however, only against a litigant who unsuccessfully litigated an issue as a party to a prior suit, *see id.* at 159 n.4 (describing offensive and defensive uses of nonmutual collateral estoppel), and it applies rarely, if ever, against the federal government, *see id.* at 162–63. The Supreme Court held in *Mendoza* that "nonmutual offensive collateral estoppel simply does not apply against the [G]overnment in such a way as to preclude relitigation of issues such as those involved in this case." *Id.* at 162.

We agree with respondent that to the extent the state court's order would benefit petitioner, neither res judicata nor collateral estoppel should give preclusive effect to the fact findings or legal conclusions of that order in this case. Respondent was not a party (nor in privity with a party) to the state court divorce proceeding, so neither res judicata nor collateral estoppel can apply against him on the basis of any order issued therein.

**[\*11]** B.    *Inclusion of Disputed Amounts in Gross Income*

Except as Congress has otherwise provided, a taxpayer's gross income encompasses "all income from whatever source derived," including from such sources as pensions, annuities, and proceeds from life insurance contracts. § 61(a)(9), (10), and (11).[12] A taxpayer using the cash method of accounting must include items in his or her gross income for the taxable year in which they are actually or constructively received. § 451(a); Treas. Reg. § 1.451-1(a). In addition Congress has provided by statute that amounts distributed from IRAs are generally includible in the gross income of the "payee" or "distributee" and taxed as provided under section 72, *see* § 408(d)(1), and that amounts "received" under a life insurance contract, but not paid as an annuity, are includible in the recipient's gross income to the extent that they exceed the amount invested in the contract, *see* § 72(e)(1)(A), (5)(A), (C).

In some circumstances we have concluded that funds misappropriated from a taxpayer's financial accounts were not includible in the taxpayer's gross income because the taxpayer was not the payee, distributee, or recipient of the misappropriated funds. For example, observing that "[w]hether there is an economic benefit accruing to the taxpayer is the crucial factor in determining whether there is gross income," we have held that a taxpayer was not required to include in his gross income amounts that his wife fraudulently withdrew from his IRAs without his knowledge. *Roberts v. Commissioner*, 141 T.C. 569, 582 & n.19 (2013).

We reasoned that the taxpayer could not be treated as the payee or distributee of the amounts in question under section 408(d)(1) because "the IRA distribution requests were unauthorized, the endorsements on the checks that were issued pursuant to the requests were forged, [the taxpayer] did not receive the economic benefit of the IRA distributions, and the IRA distributions were not made to discharge any legal obligation of his." *Roberts*, 141 T.C. at 582 (footnote omitted). Instead, we explained, the taxpayer's wife had benefited from the IRA distributions, which she used for, among other purposes, establishing a separate household. *Id.* at 572–73.

---

[12] In 2017 section 61(a) was amended to redesignate paragraphs (9), (10), and (11) as paragraphs (8), (9), and (10). *See* Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 11051(b)(1), 131 Stat. 2054, 2089.

**[*12]** We have reached similar conclusions in cases where a taxpayer's agent has misappropriated the taxpayer's funds while purporting to act on the taxpayer's behalf. In *Grant v. Commissioner*, T.C. Memo. 1995-29, 69 T.C.M. (CCH) 1716, 1719, for instance, we pointed out that although a taxpayer is generally treated as the recipient of any income received by his or her agent, that rule does not apply "where the agent receives and misappropriates funds for his own use, where the principal had no knowledge of such misappropriation, and where the principal received no economic benefit from the misappropriated funds." The evidence in *Grant* showed that an agent whom the taxpayers had engaged to help them consolidate and pay personal debts had caused a distribution from one of their pension accounts without their knowledge or authorization, and that their agent (and the debt consolidation company with which he worked) had kept the money instead of using it to pay their debts or otherwise benefit them. *Id.* We accordingly held that the distribution was not includible in the taxpayers' gross income. *Id.* Relatedly, we have held that where an agent appointed under a power of attorney made withdrawals for her own benefit from the principal's accounts, and the power of attorney had not authorized the agent to make gifts to herself, the amounts in question were properly characterized as the agent's income. *Wilkinson v. Commissioner*, T.C. Memo. 1993-336, 66 T.C.M. (CCH) 270, 274–75.

Our reasoning in *Roberts*, *Grant*, and *Wilkinson* applies with equal force in this case, where the withdrawals that Jacqueline made from petitioner's accounts were outside the scope of her authority under the POA, made without his knowledge, and did not result in any economic benefit to him.

We interpret powers of attorney in accordance with state law, *see Estate of Powell v. Commissioner*, 148 T.C. 392, 417 (2017), and the POA at issue here stated that it was governed by Florida law. The Florida Power of Attorney Act establishes that a power of attorney authorizes an agent to act in place of a principal as provided by statute, the common law of agency, and principles of equity. *See* Fla. Stat. §§ 709.2102(9), 709.2301 (2022).

An agent appointed under a power of attorney has a fiduciary relationship to the principal. Fla. Stat. § 709.2114(1). Therefore, "[n]otwithstanding the provisions in the power of attorney" an agent "[m]ust act in good faith" and "[m]ay not act contrary to the principal's reasonable expectations actually known by the agent" or, except as otherwise permitted by law, "in a manner that is contrary to the

**[*13]** principal's best interest." *Id.* Florida law permits a principal to authorize an agent to take certain actions that may be contrary to the principal's best interest, such as making gifts of the principal's property and changing beneficiary designations. Fla. Stat. § 709.2202(1)(c), (e).

In general, "an agent may only exercise authority specifically granted to the agent in the power of attorney and any authority reasonably necessary to give effect to that express grant of specific authority," Fla. Stat. § 709.2201(1), and "powers of attorney are strictly construed and will be closely examined in order to ascertain the intent of the principal," *Manor Oaks, Inc. v. Campbell*, 276 So. 3d 830, 833 (Fla. Dist. Ct. App. 2019) (quoting *De Bueno v. Castro*, 543 So. 2d 393, 394 (Fla. Dist. Ct. App. 1989)). As a result, a general grant of authority to an agent normally must yield to a more specific limitation of the agent's authority so as to avoid rendering the specific limitation superfluous. *See James v. James*, 843 So. 2d 304, 308 (Fla. Dist. Ct. App. 2003).

As we have noted, the POA authorized Jacqueline to make gifts of petitioner's property and to take actions that could otherwise be understood to constitute prohibited self-dealing. But the same sentence in the POA that authorized Jacqueline, as petitioner's agent, "to take actions . . . that may benefit the agent . . . by providing for health, education, maintenance or support" immediately limited that authority by explaining that "in other words, actions that might otherwise be considered prohibited as self-dealing are specifically authorized . . . for the purpose of tax, financial or estate planning, *for* [*petitioner's*] *benefit*, or for qualifying for public assistance . . . for which [petitioner] may be eligible." (Emphasis added.)

This sentence, strictly construed, does not amount to an open-ended authorization for Jacqueline to exercise her authority under the POA for her own benefit. Instead, its clear implication is that Jacqueline was authorized to take actions that would benefit herself only if the benefit to her was incidental to planning undertaken primarily to benefit petitioner, or to ensuring that petitioner would qualify for public assistance. Construing the sentence to grant any broader authority to engage in self-dealing would render superfluous the clarifying restatement of the grant of authority following the phrase "in other words."

The preponderance of the evidence establishes that Jacqueline engaged in self-dealing for her own benefit and not as an incident to accomplishing any authorized purpose on petitioner's behalf.

[*14] Jacqueline testified at trial that she withdrew money from petitioner's accounts and used it to move, establish a separate household, and pay her living expenses. The statements for the joint checking account confirm that Jacqueline caused the distribution of at least $89,877.09 from petitioner's Pershing IRA and $47,592.57 from his Pruco life insurance policy, and that she withdrew or transferred all but $6,561.02 of that money from the joint account soon after the distributions. These transactions took place while petitioner was incarcerated, and he was unaware of them until he was released and returned home.

Except to the extent that petitioner concedes that $10,800[13] of the total amount distributed by Pershing is properly includible in his gross income, he did not plausibly benefit from any use of the funds that Jacqueline concedes she withdrew from petitioner's life insurance and IRA account and used for her benefit. Because the POA authorized Jacqueline to engage in self-dealing only in connection with specified activities undertaken for petitioner's benefit, her use of the remainder of the withdrawn funds for her own benefit constituted unauthorized self-dealing and was a breach of her fiduciary duty.[14] We therefore find

---

[13] We observe that this amount is equivalent to nine monthly distributions of $1,200—i.e., the total amount that petitioner likely would have expected to be distributed between April and December 2014 to replace his discontinued Social Security benefits. Moreover, this amount exceeds the $6,561.02 difference between the total deposits to the joint account from Pershing and Pruco and the amounts that were withdrawn or transferred from the joint account soon after those deposits. We accordingly conclude that the $10,800 that petitioner concedes is includible in his income includes the otherwise unaccounted for $6,561.02 of deposits into the joint account, and we need not inquire further into the ultimate disposition of that portion of the deposits.

[14] Moreover, even if the POA could be construed to authorize self-dealing under these circumstances, Jacqueline still would have breached her fiduciary duty because her actions were contrary to petitioner's reasonable expectations that were actually known to her. Jacqueline acknowledged at trial that she corresponded with petitioner by letter and telephone while he was incarcerated. Petitioner's letters to Jacqueline indicated that he wished to give her control of his property because he feared for his safety, and Jacqueline indicated at trial that she understood as much from their correspondence. The letters further indicated that despite petitioner's statements suggesting that he wanted to give property to Jacqueline, he expected her to use the POA to conserve his property for their joint benefit: petitioner stated that he wanted Jacqueline to make him the "beneficiary" of the property, and he exhorted her to "use all wisely" and "be careful" because they would not be able to replace his savings. We also found credible petitioner's testimony that he directed Jacqueline by telephone to obtain the POA so that she could withdraw $1,200 per month from his savings to

**[*15]** that petitioner did not authorize the remainder of the withdrawals and that Jacqueline was, more likely than not, the economic beneficiary of $79,077.09 of the distributions from Pershing and $47,592.57 of the distributions from Pruco. She, rather than petitioner, is therefore the distributee or recipient of those amounts.

This leaves unaccounted for $33,140.91 of disputed IRA distributions and, assuming for present purposes that petitioner reported the life insurance proceeds on his return as pensions and annuities, $19,485.43 of disputed pensions and annuities. We infer from the evidence we have just described, and find it more likely than not, that Jacqueline (and not petitioner) was also the economic beneficiary, and thus the distributee or recipient, of those amounts.[15]

Under the circumstances of this case, we therefore conclude that petitioner was not the distributee, payee, or recipient of any portion of the disputed amounts, and those amounts are not includible in petitioner's gross income for 2014.

III. *Issues Other than the Underlying Tax Liability*

We review the remaining issues relating to Appeals' determination for abuse of discretion. For 2014 we find no error in Appeals' determination except to the extent that the SO declined to adjust the amount of petitioner's underlying tax liability. Our review of the administrative record confirms (and petitioner does not dispute) that the SO properly verified that all requirements of applicable law and administrative procedure were satisfied, and petitioner has stipulated that he did not seek a collection alternative during the CDP hearing.

In the absence of a proposed collection alternative, we find no error in the SO's conclusion that the proposed levy appropriately balanced the need for efficient collection of taxes with petitioner's legitimate interest that the collection activity be no more intrusive than necessary. *See, e.g.*, *Roberts v. Commissioner*, T.C. Memo. 2021-131,

---

replace his suspended Social Security benefits. In view of these circumstances, which were known to Jacqueline, we do not think she could have concluded that petitioner reasonably expected her to liquidate his accounts and use all of the proceeds for her sole benefit.

[15] We note in this regard that respondent conceded at trial that the disagreement between the parties is limited to whether the disputed amounts are petitioner's income and does not encompass whether the disputed amounts were withdrawn from petitioner's accounts.

**[\*16]** at \*8 ("It is not an abuse of discretion to decline to consider something that was never proposed."). We therefore sustain Appeals' determination concerning 2014 to the extent that any unpaid balance remains due after petitioner's underlying tax liability is adjusted to reflect our conclusions herein.

IV.   *Conclusion*

In accordance with petitioner's concession concerning 2013, we will sustain Appeals' determination to proceed with the proposed levy for that year. With respect to 2014, we hold that the disputed amounts are not includible in petitioner's gross income. We will consequently sustain Appeals' determination to proceed with the proposed levy for 2014 only to the extent of any unpaid tax liability that remains due after the amount of that liability is adjusted to reflect the correct amount of petitioner's gross income.

To reflect the foregoing,

*Decision will be entered under Rule 155.*